## IN RE APPLICATION TO DISSOLVE THE MANSFIELD RAILWAY, LIGHT & POWER COMPANY.

*Corporations—Dissolution by stockholders—Sections 11938 and 11943, General Code—Interlocking directorate—Interurban and street railway companies—Dividends passed on preferred stock —Unprofitable contracts and traffic agreement—Capital and maintenance charges.*

1. Under favor of Section 11938, General Code of Ohio, a corporation may be dissolved "When a majority of the directors, trustees, or other officers having the management of the concerns of a corporation, or stockholders representing not less than one-third of the capital stock of a corporation, organized under the laws of this state, discover that the stock, property, and effects of the corporation have been so far reduced, by losses or otherwise, that it will not be able to pay all just demands for which it is liable, or to afford a reasonable security to those who deal with it, or deem it beneficial to the interests of the stockholders that the corporation be dissolved; ·or when such directors, trustees, or other officers are authorized, by a majority· of the stockholders, to apply for a judgment ·as hereinafter provided, or when the objects of the corporation have wholly failed, or are entirely abandoned, or their accomplishment is impracticable, they may apply by petition to the common pleas court of the county, or the superior court of the city or county, in which the principal place of conducting the business of the corporation is situated, for its dissolution pursuant to the provisions of this chapter."

2. Under Section 11943, General Code of Ohio, it is provided that "When the report is made, if it appears to the court that the corporation is insolvent, or that its dissolution will be beneficial to the stockholders, and not injurious to the public interest, or that the objects of the corporation have wholly failed, or been entirely abandoned, or that it is impracticable to accomplish such objects, a judgment shall be entered dissolving the corporation, and appointing one or more receivers of its estate and effects. The corporation thereupon shall be dissolved, and cease."

(Decided June 29, 1914.)

ERROR: Court of Appeals for Richland county.

By the Court (Voorhees, Shields and Powell, JJ.).

This action for the dissolution of The Mansfield Railway, Light & Power Company was made under favor of Section 11938, General Code, and was tried in the court of common pleas at its September term, to-wit, December 30, 1912, and it was decreed that said corporation be dissolved and its property be sold as prayed for in the petition.

Error proceedings were prosecuted to the court of appeals and heard at the January term, 1914.

The necessary parties were brought into said proceeding and issue with the petition was joined by separate answers of the parties in interest and the cause was heard in the said court of common pleas of Richland county, upon the record that was made of the testimony and exhibits taken by the master commissioner, appointed by the court of common pleas for that purpose, and such proceedings were had that the court of common pleas at the September term, to-wit, December 30, 1912, decreed that said corporation be dissolved and that its property be sold, as prayed for in the petition.

Motions for new trial were filed by the respective parties in interest, complaining of the decree, which motions were overruled and exceptions taken by the respective parties complaining of said judgment and decree.

The case has been submitted both by oral argument and by briefs filed by the respective parties, and, in addition to the briefs filed, the opinion of the court below, rendered by Judge Edwin Mansfield, has been submitted to us for consideration.

After a very careful examination of the opinion and the synopsis of the testimony made by the court, we think it would be a task of supererogation to undertake to add to or improve the analysis made by the judge in said opinion.

Therefore, we adopt the opinion of said court of common pleas, filed herewith, as the judgment of this court, and affirm the judgment of the court below, with costs and without penalty. Exceptions for the respective parties who may desire to prosecute error to this judgment of affirmance. Remanded to the court of common pleas for further proceedings according to law.

*Judgment affirmed.*

*Mr. Rush Taggart* and *Mr. W. S. Kerr,* for plaintiffs in error.

*Messrs. Cummings, McBride & Wolfe,* for defendants in error.

The opinion of Judge Mansfield is as follows, to-wit:

This action for the dissolution of The Mansfield Railway, Light & Power Company is filed under favor of Section 11938, General Code, which provides:

"When a majority of the directors, trustees, or other officers having the management of the concerns of a corporation, or stockholders representing not less than one-third of the capital stock of a corporation, organized under the laws of this state, discover that the stock, property, and effects of the corporation have been so far reduced, by losses or

otherwise, that it will not be able to pay all just demands for which it is liable, or to afford a reasonable security to those who deal with it, or deem it beneficial to the interests of the stockholders that the corporation be dissolved; or when such directors, trustees, or other officers are authorized, by a majority of the stockholders to apply for a judgment as hereinafter provided, or when the objects of the corporation have wholly failed, or are entirely abandoned, or their accomplishment is impracticable, they may apply by petition to the common pleas court of the county, or the superior court of the city or county, in which the principal place of conducting the business of the corporation is situated, for its dissolution pursuant to the provisions of this chapter."

Subsequent sections prescribe the necessary procedure, the appointment of a master and the filing of the master's report containing the evidence, exhibits and proof adduced under the allegations of the petition, together with the statement of the property, effects, debts, credits and engagements of the corporation, and all other matters pertinent to the inquiry, and by Section 11943, General Code, it is provided:

"When the report is made, if it appears to the court that the corporation is insolvent, or that its dissolution will be beneficial to the stockholders, and not injurious to the public interest, or that the objects of the corporation have wholly failed, or been entirely abandoned, or that it is impracticable to accomplish such objects, a judgment shall be entered dissolving the corporation, and appointing one or more receivers of its estate and effects. The

corporation thereupon shall be dissolved, and cease."

The applicants predicate their right to the dissolution of the corporation in question wholly upon the ground that it will be for the best interest of the stockholders of the company, and if the facts in this case warrant a finding to that effect and a dissolution will not be injurious to the public interest, then, under Section 11943 of the General Code, a dissolution should be awarded. So in this investigation two principal questions are to be determined from the record, first, will a dissolution of the corporation be for the best interest of the stockholders of the company, and, if it would, then the further inquiry, would such dissolution be injurious to the public interest?

I have read the record in this case twice, some parts of it three or four times, also gone carefully over the several exhibits (the record and exhibits making more than 1,000 pages), in order that I might acquaint myself with the full scope of the inquiry before the master and ascertain the contention made by the various parties. But for the purposes of this opinion only such matters will be taken up for analysis as appear pertinent to the issue raised by the pleadings of the parties.

The Mansfield Railway, Light & Power Company was organized in March, 1903, for the purpose, ostensibly, to succeed and take over the property of The Citizens Electric Railway, Light & Power Company, which latter company for some years prior thereto was the owner and operated an electric railway in this city and furnished elec-

tricity for light and power purposes. The charter of the new company provided for an authorized capital of $1,000,000, and the plant of the old company—that is, The Citizens Electric Railway, Light & Power Company—and its property rights and franchises were purchased by the new company for a consideration of $1,417,000, $1,000,000 of which was to be paid for in stock of the new company, and presumably distributed pro rata between the members of the old company, and $417,000 of bonds of the new company. At the time of the purchase, to take care of the $417,000 of the bonds, and to provide further credit for the new company and to secure certain indebtedness of the old company, a total bond issue of $1,000,000 was authorized by the new company, and this bond issue was distributed as follows: For immediate use, $450,000; to be retained in the treasury to be sold for betterments and improvements, $350,000; to take care of $200,000 of outstanding consolidated bonds of the old company, $200,000.

All of these bonds are now outstanding with the exception of $58,000 of unsold bonds of the $350,000 provided for betterments, and of those sold the sum of $286,000 was received, they having been sold for less than par, under the arrangement entered into at the time of their issue, and the money disbursed for the purpose of making improvements and betterments. All the bonds bear 5 per cent. interest, due semi-annually, on the first of April and October of each year, and all being due on April 1, 1918. They were secured by mortgage upon the real estate, property and franchise of the company.

By article four of the mortgage or trust deed given to secure the mortgage it was provided that "A reserve fund shall be created and maintained for acquisition, renewals, replacements, improvements and extensions of the property of the company, but not for ordinary repairs, which shall consist of and be maintained by setting aside by the railway company, if, as and when the same is earned over and above the fixed charges, the sum of $10,000 on the 15th day of July, in each and every year, until the maturity of the bonds herein provided for; this fund shall be used for the purpose above set forth in addition to the amount derived by the issue of bonds and any sum left in said reserve fund may be applicable to the payment of said bonds."

On the 16th day of November, 1906, such proceedings were taken by the stockholders by which the articles of incorporation were amended, by which amendment it was provided that the capital stock, common and preferred, shall be $1,000,000, consisting of 6,500 shares of common stock of the par value of $100 each, and that the holders of the preferred stock shall be entitled to a dividend of 6 per cent. per annum, payable quarterly, on the first days of February, May, August and November of each year, out of the surplus profits of the company for each year, in preference to all other stockholders, and such dividends shall be cumulative.

It was further provided that after five years from the date of issue the preferred stock may be redeemed at $115 per share, and the holders thereof shall not be entitled to vote except in case of default in the payment of any two dividends, in

which event the right to vote shall immediately accrue and continue as long as any dividends are unpaid.

At the meeting creating and authorizing the issuing of preferred stock it was further provided that said preferred-stock issue be issued to the holders of the common stock up to the amount of 85 per cent. of the common stock and the amount of common stock so exchanged shall be surrendered and cancelled.

In pursuance of said amendment and resolution of the stockholders' meetings and board of directors making provisions for said preferred stock and its distribution, each of the holders of common stock exchanged the percentage of their holdings named for preferred stock and caused to be cancelled the common stock for which the preferred stock was exchanged. On said 16th day of November, 1906, the board of directors declared a quarterly dividend of $1\frac{1}{4}$ per cent., payable on the 1st day of February, 1907, and for each quarter thereafter for the year 1907 dividends were paid on the preferred stock.

Prior to the 1st day of August, 1907, The Cleveland & Southwestern Electric Railway Company was organized. It operated an electric railway extending from Bucyrus, by the way of Galion and Crestline, to Mansfield, Ohio, its tracks terminating near the west corporation line on what is known as Spring Mill street, and from thence into this city it ran its cars over the tracks of the local company. On the east of the city the Southwestern owned a line running from this city east by the way of Ashland and Seville to Cleveland, Ohio. Both of these

lines were in operation and running over the tracks of The Mansfield Railway, Light & Power Company under an arrangement between them, the local company in each instance owning the track and controlling the right of way and franchise within the city to or near the corporate limits.

On August 1, 1907, the Cleveland & Southwestern Company purchased 5,056 shares of the common stock of the Mansfield Company, this purchase giving it a majority of all the outstanding stock and controlling interest in the company. At a special meeting of the Mansfield Company, held on the 23d day of September, 1907, by resignation of certain members of the board of directors vacancies were created which were filled by the selection of persons representing the interest of the Southwestern Company, giving to the Southwestern a majority of the board of directors and to the holders of preferred stock a minority representation on the board. On the 10th day of June, 1907, prior to the acquisition by the Southwestern of the common stock of the company, at the stockholders' meeting for the purpose of selecting a board of directors and transacting other business, more than 6,000 shares were represented, of which S. N. Ford was a holder and voted 528 shares, Thomas W. Latham 2,275 shares, Reid Carpenter 2,785 shares and Rush Taggart, by Reid Carpenter, proxy, 526 shares. All of this apparently was common stock, as it would appear that the stock purchased by the Southwestern on the 1st day of August, 1907, must have come from the holdings of stock represented at said meeting, and when the deal was made of the sale to the Southwestern for a price of $125,000 for

the 5,050 shares, the selling parties must have known that the control was passing into the hands of that company, and they, as interested parties in that deal, at least ought not to be heard to complain or raise the question that such purchase of the Southwestern was illegal or that such purchasers should be precluded from exercising lawful rights as such stockholders in the management of the corporation and the selection of the agents to carry on the business.

Upon the other hand, in the purchase of the common stock the Southwestern people are hardly in position to question the adequacy of price they paid for the stock, or its value at the time they purchased it, nor the value of the business or plant in which they were purchasing an interest. They undoubtedly knew what they were purchasing, must have known the classes of stock outstanding —that one-third of it was preferred stock. They were men of experience in that class of securities, were at that time operators of electric railways and were experienced in large business transactions and affairs, so they are in no position to complain of the value of the stock they were purchasing any more than the minority could complain of surrendering control under such purchase. They both must have known the new condition that would result from such transaction—the selling parties that control was to pass to the purchasers, and the purchasers that they were securing the control, subject to the limitations provided for the benefit of the holders of preferred stock.

As hereinafter referred to, the Southwestern interests are now questioning the integrity of the

preferred stock, claiming that it is not entitled to any preference in distribution of dividends or otherwise over the common stock. Whatever may be the merits of that contention so far as this cause is concerned, it does not appear but that it was rightfully issued under the statute and that the holders thereof are *bona fide*. *Prima facie,* without any showing to the contrary, it appears to be a valid issue of stock, and must therefore be presumed to be a valid issue and be treated as such in the disposition of this case, at least so far as now concerns the main question at issue.

So then we approach the analysis of the facts of this case, first, that the acquisition of the common stock by the Southwestern, which gave it control, was legal, and second, that the outstanding preferred stock is a legal issue.

It is very apparent that the purchase by the Southwestern was not with the expectation of returns by way of dividends on the stock they had purchased, for if their contention is true that the earnings of the company were not sufficient for the purpose of declaring dividends on the preferred stock, it would be hard to conceive what the purchase of the common stock would be upon the basis of a mere investment. It is very clear from the evidence that under the most favorable arrangement, after taking care of necessary improvements and maintenance and dividends on the preferred stock, it would be uncertain whether the common stock would ever reach a dividend basis. So, taking that fact into consideration with the price that the Southwestern paid for it, it is clear the purchase was not made with much hope of divi-

dends from such source, if the integrity of the preferred stock be maintained, but, on the contrary, to secure control for the purpose of making the local company an integral part of the Southwestern system. But such purpose in itself would not be illegal, providing the control so exercised would not work a hardship upon the corporation itself or be injurious to the minority stockholders.

The Southwestern was the larger and more important company. Its combined lines represented a large and complete system of electric railways, and a conservation of this larger interest would naturally draw in its direction the greater attention of those placed in a dual relation to each company. Wherever and whenever duties are to be exercised by one who is placed in a position to decide between possibly conflicting interests, it is naturally to be supposed that decision will follow the greater interest even though no fraud is practiced or intended. It is a most delicate situation even for the fairest-minded men to get into. Human experience has taught us that the greater favor follows the greater interest, and this is true whether actions result from the individual or a combination of individuals, when the number represent a class whose interests are mutual. Where there are no conflicting interests there can be no valid objection to the majority of a board of directors of one corporation being in control or constituting the board of another corporation, but where there are conflicting interests then the minority are entitled as of right to have the acts of the majority most closely scrutinized in reference to such conflicting interests, and every inference and intendment

should be resolved against the majority exercising control under such circumstances.

Under such circumstances members of a board cannot occupy a neutral position; their interest must always be a partisan one and partisan on behalf of that company which they are serving in the capacity of directors. In the very nature of things they would not be expected to exercise that partisan interest which would respond to their full duties as members of a board looking to the interest of the company if, at the time they were called upon to formulate action, their interests in a larger corporation were in conflict with those of the corporation for which they were then acting.

There is no dispute but that the company is and has for some years been fairly prosperous. It is solvent and has met its obligations from time to time to its creditors, and upon the whole its management by local executive officers has been as good and as businesslike as could reasonably be expected with the equipment and plant furnished for the purpose of operation. There is no complaint that the money expended for improvements and betterments, whether out of the earnings or from the proceeds from the sale of bonds, were not proper and necessary in the due prosecution, upkeep and extension of its lines, and it would seem that under ordinary conditions and harmonious action upon the part of the several interests represented on the board of directors, the future of the company would be bright and much value added not only to the service it could render to the public but also to its capital.

But it is contended that the general policy of the company has been determined by the control of interests that are antagonistic to the general welfare and prosperity of the company and the rights of the minority, that dissensions of a grave and serious character have arisen between the minority and majority as to the proper and judicious internal management of the company, and that the majority in control have gone to the extent of exercising their power to the sacrifice of the rights of the minority and to impair the value of their securities. If internal dissensions arise between stockholders and such differences are of such grave character that the natural and logical result would tend to destroy or impede the efficient management of the corporation in carrying out the purposes for which it was created, or if the dissensions or differences between stockholders, brought to the very doors of the controlling board of the corporation, were of that grave character and importance that the security of the stockholders became imperiled, resulting in loss to them in the diminution of the value of their stock securities or of returns justly due them by way of dividends or other profits and benefits arising from their relations to the corporation as stockholders, then such dissensions and lack of harmony undoubtedly would afford a valid, sufficient reason, if clearly shown, to warrant a dissolution of the corporation, and this would be true even though at the time of the application for dissolution the corporation appeared to be in a prosperous condition and otherwise carrying out the purposes for which it was organized.

The property, plant and franchises of the company on the 1st day of January, 1911, as shown by the books, were valued at $2,117,809.33. The original price paid for the company was $1,417,000. Since then there has been expended for betterments out of the sale of bonds $286,000, making a total of $1,703,000. Deducting this amount from the book value of January 1, 1911, would leave $414,809.33, which would represent the added value to the property of the company, during that period of time, outside of the disbursements made from the sale of bonds. This added value, of course, must have come from the application of earnings of the company during that period for the purpose of betterments or from the natural increase of value to the property of the company itself. That the greater part of it came from the earnings is very apparent from the evidence.

It is contended, however, that in many instances items were charged to capital account which ought to have been charged to income account, and that the total of such amounts, after deducting proper credits, would reduce the book value $134,997.55, or that the book value, instead of being carried at the figures of $2,117,809.33, should be $1,982,-811.78. It is also claimed that during this period of years nothing has been charged off for depreciation, and that, on account of the character of the equipment necessary in that line of business, the depreciation is a considerable figure each year. Upon the other hand, it is contended that the machinery and equipment have been maintained at a high standard of efficiency and that all expenses for such maintenance have been charged to oper-

ating expense and not to capital account, and that therefore depreciation really is a negligible quantity.

But for the purposes of this case, as will hereafter appear, the court does not deem it important to analyze the respective contentions of the parties in the above respect. The above figures are exhibited simply to show that the company has had a growth, and a valuable one, that it is in a fairly prosperous condition and that it was a property of value which should naturally invite the business attention of all persons having stock interest in it.

The petitioners for dissolution represent 3,624 shares of preferred stock and 562 shares of common; the Southwestern represents 5,050 shares of common stock; and 476 shares of preferred stock and 888 shares of common are held by other stockholders who are not parties to the suit by way of petition or by way of answer, unless they are represented as such by the company in its answer.

The petitioners set forth in their application for a dissolution of the corporation several specified acts which they claim are of such a character as tend to show that a dissolution of the company would be beneficial and for the best interests of the stockholders. I do not understand that they rely upon one specific act, but contend that all the acts complained of together, which they claim have been sustained by the evidence or inference deduced therefrom, are sufficient to warrant a dissolution of the corporation on the ground that it would be for the best interest of the stockholders of the company. I do not think that a too limited meaning should be given to the work "stockholders" as used

in the statute—that is, a dissolution of a corporation might not be for the benefit or the best interest of the stockholders who own the controlling interest in it, and yet that controlling interest might so direct the affairs of the corporation that the minority would greatly suffer, and if it would be for the benefit of the minority to have it dissolved and the situation that gave rise to such conclusion resulted from the unwarranted acts of the majority or the prosecution of a policy incompatible with such rights as shareholders, the majority could not take advantage of the technical objection that the dissolution was not for the benefit or best interest of all stockholders.

In other words, I take it, under the letter and spirit of the statute, it was the intention of the legislature to give to minority stockholders a certain remedy for their protection by causing the company to be dissolved in cases where the same appears reasonably necessary for their ultimate protection and for their best interests, especially in a case where a majority, who assume to control the interests of a company without a just regard for the rights of the minority, seek to direct its affairs in the interest of another company in which the minority are not concerned and to their prejudice.

A court of equity has no power to dissolve a corporation. Dissolution of a corporation can only be accomplished in the legal method provided by statute, and it seems the legislature, by the terms of the statute, fairly construed, has provided a means to accomplish that end, when the necessity arises, for the protection of minority stockholders. A court of equity might intervene in such cases by

the appointment of a trustee to vote the stock of the majority, or directly determine who should represent such majority, so long as conflicting interests existed between two companies, but the method provided by statute is more easily applied and as certain and as just as any remedy equity could afford.

Going to the direct issue involved in this controversy, and that is, are the acts and conduct of those representing the majority of the common stock and the effect of such acts and conduct on the interest of the minority or of the stockholders generally of the local company of such a grave character as would warrant an order of dissolution under the statute? This brings us then to a consideration of the specific acts complained of in the petition and their relation and connection with each other, and these claims will now be taken up for analysis.

On the 23d day of September, 1907, after the acquisition of the common stock by the Southwestern, the new board of directors, composed of four members selected by the Southwestern and three members by the minority, assumed the direction of the affairs of the company, and at this meeting, by unanimous vote of the board, it was ordered that the company build 1,800 feet of track and necessary apparatus on Grace street from Wayne street to Central avenue; 800 feet of this in the city limits, to be paid for by the local company, and 1,000 feet to be paid for by the Southwestern. The building of this track constituted the connecting link between the city company and the Southwestern.

It appears it was a fair and just arrangement between the two companies, with mutual benefits to both companies and with no advantage of one over the other, and involving no conflicting interests. It was a contract which the parties might lawfully enter into, absolutely fair and just to each, and concerning which both the minority and majority represented on the board were all of one opinion, so not sufficient importance can be attached to this act of the board or of the part taken by the majority in such arrangement to sustain the claim of petitioners.

Another contention made by the petitioners is that a very important part of the business of the city company is over the Shelby line, which forms a part of its property; that this line, through its connection with the Big Four railroad, furnishes the most direct and desirable way to Cleveland; that when the Southwestern built its line into the city it offered a new and direct line from this city to Cleveland, and since the construction of the latter line much of the traffic which theretofore went by way of Shelby has been diverted over the Southwestern, and that the city company's income has suffered thereby. Petitioners say that they have no right to complain of the competitor controlling its affairs. But the evidence does not disclose that the income of the city company has suffered by reason of these additional facilities to reach Cleveland; additional facilities would undoubtedly invite increased traffic, and perhaps the Southwestern may be used by many in preference to the Shelby line, but these are natural conditions which appeal to the traveling public to suit their own purposes.

There is no testimony showing that the Southwestern by interference, solicitation or otherwise diverted traffic from the Shelby line to its line. It appears from the evidence that the officers and agents in charge of the joint-ticket office sell tickets to passengers over such line and route designated by the passengers without solicitation on the part of such officers. On the other hand, it is evident from the increased earnings of the local company since the building of the Southwestern into the city that the latter company has been a feeder to the city lines, and undoubtedly the city lines in some measure have been a feeder to the Southwestern; that all taken together have given and are giving our citizens additional facilities and advantages.

It may be true that many people use the Southwestern to reach Cleveland, for reasons personal to themselves, who formerly used the Shelby line to reach the same destination; but this would be true whatever the relation may be between the two companies, and it is not to be inferred that the diversion of such traffic was caused by reason of the interest of the Southwestern, when it is easily accounted for on other just and reasonable grounds, in the absence of proof of activity on the part of the Southwestern or their agents to accomplish that end. The two companies are not, in the strict letter of the word, competitors so far as traffic between terminal and intermediate points are concerned. The interurban points reached by the Southwestern are not reached by the lines of the city company; to do so traffic must rely upon connections with companies in which the city company has no relation. It is not claimed that the Southwestern infringes

upon the city company in its business of local fares; so then, in the above respect, there can be no such competition as would prevent the legal acquisition by the Southwestern of stock in the local company or such competition that it could be said that their rights in that respect were antagonistic. But there is, however, another consideration, and that is, the Southwestern traffic passes into and through the city over the tracks and lines of the city company. Out of this situation many conflicting interests necessarily arise, growing out of the privilege to be accorded to the Southwestern in that use and the corresponding burden on the track and the equipment of the city company.

The determination of these rights are important to each company, not only as to compensation to be made by the one company to the other for the use of the track and the burden placed on its equipment, but also in the creation of increased facilities to take care of the growing traffic and interferences that naturally arise growing out of the arrangement of schedules for the operation of the different cars.

In the adjustment of these differences and in entering into a contract determining the respective rights of the parties in the enjoyment of the privileges and rights thereunder, the parties to such contract should be placed in such relation that they can deal with the subject at arm's length. The local company surely should have the right to dictate the terms and conditions of such an arrangement by a board wholly moved by a consideration of the best interests of the local company, without

such action being influenced out of consideration for the welfare and business interests of the Southwestern, which situation it would be hard to conceive could exist where the majority in control of the local board would be in the hands of the representatives of the Southwestern. In coming to this conclusion it is not necessary to impugn the motives or good faith of the majority, but simply to yield to the logical conclusion that in all points of differences material to the interests of the local company antagonistic to the Southwestern, naturally the doubts or favors, if we may call them such, would be resolved by the majority to the benefit of the Southwestern. That this very situation arose between these companies is in a measure amply sustained by the evidence. The record discloses that in February, 1909, the representatives of the Southwestern presented a contract to the board of the local company providing and defining terms upon which the Southwestern might run its cars over the city lines, arranging for traffic and the stringing of high-tension lines on the poles and equipment and containing other provisions generally regulating matters in that respect between the two companies. Upon presentation of this contract to the board the minority secured a delay of action, and, pending that delay, obtained an injunction against the company from entering into the contract, which injunction is still in full force and effect.

It is contended by the defendants that the delay in question was not secured by the minority in good faith; that the majority, when action was delayed, intended to take up the discussion of the contract in

good faith, looking to a reasonable arrangement and fair contract between the parties; that when the contract was submitted blank spaces were left for the purpose of inserting a reasonable amount to be paid by the Southwestern for the privilege it was to receive under the terms of the contract, and that before that opportunity was given to them the action of the court was evoked to enjoin any further action on their part.

Without entering into a discussion of the merits or demerits of the contract in question, it is sufficient for the purpose of this analysis to say that the minority were objecting to the contract for the reason, as they claimed, that it was in material respects grossly unfair and unjust to the local company, and that it would give to the Southwestern permanent rights which the local company ought not to concede. From this situation it appears that there was a marked difference between the contention of the minority and majority, and, under these conditions, how could the majority, as members of the local board but in reality representing the Southwestern, whose rights and interests were to be protected and conserved by an engagement covering a period of several years, act upon the contract free from bias and prejudice? It would be natural and reasonable to conclude, and to so conclude without impugning their good faith and honesty of purpose, that upon all doubtful questions material to the rights of either their voice and vote would be in favor of that contention which would best inure to the benefit of the larger interest which they represented.

In other words, by the mere relation of these parties and the many ways in which a conflict of interest might naturally arise between the minority and majority, it would appear very clearly that the latter, in representing the interest of the local company, should be disqualified from exercising control or directing the entering into engagements in which the interests of both the majority and minority might be greatly different and vitally present, and so long as such relations exist with the same conditions prevailing, as surely this situation does not work for the best interest and welfare of the local company. It is a condition always present necessarily resulting from the situation of the two interests, conflicting in their nature, and must in a more or less degree seriously militate against the interests of the local company.

Another illustration: On the 29th day of January, 1908, at a special meeting of the board of directors of the local company, at which all the members were present, two resolutions were passed by unanimous vote which in a sense mark the beginning of the contention between the minority and the Southwestern interests, although at the time of their passage no lack of harmony, so far as the record appears, then existed between them. The first of these was a resolution expressing it as a sense of the board that additional power equipment was necessary, in order to properly protect the interest of the company and also to sell power to the Cleveland and Southwestern, provided that a satisfactory contract would be made for the sale of power to the Southwestern, and it was further provided that a committee, composed of Mr. S. N.

Ford, F. E. Myers and Reid Carpenter, have in charge the installation of this additional power and equipment to the plant, with full power to act in the matter. Of the members of the committee Mr. Myers was the only one who had any Southwestern interest, Mr. Carpenter and Mr. Ford being preferred stockholders. In other words, if a distinction is to be made in this connection, the minority stockholders had a majority representation on this committee.

A great deal of testimony was taken on this branch of the case as to whether or not the provisions of the resolution, if carried into effect by the committee, would have been such a business investment under the circumstances as would have produced reasonably certain profitable returns to the company, and further, whether the carrying out of the authority to equip would not have placed an additional financial burden upon the company which it ought not in good business judgment have entertained.

The petition charges in substance that the purpose of this resolution and the conferring of authority on the committee to act in the installation of a power plant were more for the service and convenience of the Southwestern than the local company, and that the power plant was not necessary under the circumstances and would so deplete the earnings of the company by its installation and necessary equipment as would not only preclude the payment of dividends on the preferred stock but would add an unnecessary financial burden on the company, inuring only to the benefit of the South-

western interest and to the great disadvantage of the other stockholders.

In pursuance of the authority imposed on the committee, Myers and Ford visited Pittsburgh with a view of purchasing a plant for such purpose from the Westinghouse company, and after much dickering finally procured a proposition from the Westinghouse company at a satisfactory figure and providing that the Westinghouse company give a guarantee that the plant and power machinery would come up to the representations and would be of the utility expressed in the proposition or offer of sale. Nothing further was done with reference to this contract except that a blank form of contract seems to have been mailed by the Westinghouse people, but it never came into the hands of any one of the committee. About this time there is some testimony tending to show that an engineer of the Southwestern presented some plan showing the necessary changes to be made in the power-plant buildings in order to meet the improvement of the plant, but these plans never were presented for adoption nor were they acted upon by either the board or the committee. The Westinghouse company submitted this contract for sale of said machinery about the 4th of April, 1908, and thereupon certain minority stockholders brought, on behalf of themselves and all other stockholders of the company, an action to enjoin the company and its officers from entering into said contract, and upon the filing of the petition an injunction was allowed by the court.

The charter of the local company was broad enough to permit it to engage in the production of

current for all the purposes named in the resolution, so the contract would not be of an *ultra vires* character. Whether or not it was the intention of the company to execute it in its entirety, is hard to glean from the testimony. Mr. Ford, the president of the company and who was a member of the committee, substantially says that he was not in favor of it, for the reason that the character of the engine to be furnished, in his judgment, was not suitable to the location of the plant and no guaranty was furnished as contemplated. Mr. Carpenter took very little part in the transaction, and nothing further was done by Mr. Myers.

It does not appear, however, that at the time of the proposed installation of additional power it was the judgment of the entire board that additional equipment was necessary to take care of the present demands of the company in order that proper service might be rendered to the public, and it does appear that at the time, and during the time covered in the taking of testimony in this case up to the time it was submitted, the company had little, if any, reserve power to meet the contingencies of breakdowns or accidents; so it would seem that the provision for power and authority to install the same was a just and proper one. But it is contended that the proposed equipment involved an expenditure of money largely in excess of the reasonable demands of the company, and that the cost of equipment would be $100,000, when a much less expenditure would answer all the requirements of the business of the local company. But I think the proof clearly shows that at an outside figure $60,000 would have covered all the expense neces-

sary to install and equip the machinery and provide the appliances and necessary changes to make it effective for the purposes provided by the resolution. This equipment at that expense would undoubtedly have furnished a power plant, taking into consideration other facilities, capable of a production of electricity largely in excess of the demands of the local company, with a reasonable factor of reserve for emergencies, and this excess of power, it was contemplated, was to be used in furnishing power to the Southwestern under the terms of the resolution.

Here then was the situation: By authority of the resolution the local company was providing a power plant of a capacity practically double the amount necessary to take care of its business, with a reasonable factor of safety for emergencies, and this excess of power was to be sold to the Southwestern for the operation of its lines. Leaving out of consideration whether or not the company was justified, as a good business proposition under the circumstances, to make the additional investment necessary to provide the amount for sale to the Southwestern, it still presents a proper inquiry as to the conditions that might well be apprehended if the power plant were enlarged for all the purposes provided by the resolution. Following the installation of the plant, a contract necessarily must be entered into fixing the character of service to be rendered and price of current to be paid by the Southwestern, and it would be a contract of no small importance, for practically it involved current sufficient in quantity to operate both the Crestline and Galion as well as the Ashland line; in fact,

it was contemplated that one-half of the current produced by the installation was to be sold to the Southwestern.

As a business proposition it must be presumed to be the duty — in fact, it would be the duty — of the board of directors to make such an arrangement for the sale of this current as would provide a reasonable profit to the company. Upon the other hand, the Southwestern would be interested in securing the most favorable terms for its benefit.

Here again arises an intolerable situation; the minority, impotent by reason of their lack of control, and the majority restrained in their freedom of action on behalf of the best interests of the company by reason of the conflict of the greater interests of the Southwestern. In such important matters it is very plain every action of the members of the board should be free from the trammel of personal interests other than those for the benefit of the company, and absolutely free from any obligation or duty that the individual members owe to another corporation. But further, at the time the resolution was passed no contract or agreement specifying the terms and conditions upon which current was to be furnished to the Southwestern was entered into. In other words, the local company was about to expend thousands of dollars in the installation of an equipment which to a large extent would have been an unreasonable expenditure unless a profitable contract with the Southwestern could have been made after it was installed. Herein lies the vice of the proposition — in the opportunity it afforded to the majority in control to force upon the local company a contract for current at a rate

that might be unprofitable. For, if after an investment for that purpose by the local company, the representatives of the Southwestern on the board of the local company could not agree with the minority upon a reasonable contract, to the extent that such investment exceeded the requirement of the local company an additional burden would be placed upon it to carry such additional investment without profitable return; or if such majority forced upon the company an unreasonable contract, the execution of which a court of equity would enjoin, the results would be the same, for it is to be remembered that the only available customer for excess current above the demands of the local company was the Southwestern.

It is contended, however, that the claim of the petitioners in the above respect comes with little force for the reason that the application for the dissolution of the company was not filed until the 19th day of March, 1909, some fourteen months after the passage of the resolution to enlarge the equipment for additional power; that in the interim the Southwestern wholly abandoned any purpose to secure power from the local company, and in December, 1908, laid the foundation for a power plant at Elyria, Ohio, and by May, 1909, had it fully installed and connected with high-tension lines to supply power to the Ashland line and the line west of Mansfield, and that at times since such installation it furnished current to the local company in case of emergency arising from breakdown in its plant and equipment or other causes. But the relation existing between the majority and minority concerning any particular transaction must be

measured by the circumstances surrounding the parties at the time, and not by subsequent conduct that in all probabilities resulted from the necessities of the case in the particular instance to create sufficient power along its own lines for the use of its system of railways. The consummation of the proposed contract had been enjoined by the court, which in itself forced the Southwestern to provide other means to provide current; so the claimed abandonment is more referable to the necessities of the case than to any other cause.

Reference might also be made to another matter of not so much importance, but as indicating the influence of the Southwestern in directing the policy and internal affairs of the company, and that is, for something over a year the local company furnished the Southwestern with current; that growing out of this service credits accrued in favor of the local company in the sum of $16,000, and although these bills were due practically at the expiration of every thirty days, they were not paid when due and were carried by the company for practically a whole year. It is not claimed that the delays in payments were caused by any serious misunderstanding as to the amounts or of the items making up the account from time to time or any other serious controversies. In fact, there is no reason given for failure to pay promptly except perhaps that the Southwestern could use the money, and the accommodation seems to have been extended for that reason. All these accounts, however, before the testimony was concluded in this case, had been paid, so that the claim in this respect, standing by itself, would not, as I have said, come

with very much force, but taken in consideration with all other circumstances it forms a link in a chain of circumstances to indicate the control and direction of the affairs of the local company to the favor of the Southwestern and not to the single purpose of guarding the interests of the local company and the stockholders that of right are entitled to that protection.

Defendants have cited numerous authorities which it is claimed are against the main contention made by the petitioners, the most notable one perhaps being that of *In the Matter of the Franklin Telegraph*, 119 Mass., 447, in which case the syllabus is as follows:

"Under the General Statutes, chapter 68, section 35, authorizing this court 'for reasonable cause' to 'decree a dissolution of' a corporation, upon petition by a 'majority in number or interest of the members,' it is no ground for the dissolution of a telegraph company that it leased its line to another company at a less rent than it might have obtained, fraudulently intending to give the benefit of the lease to the second company, in which the majority in interest of the stockholders of the first company were also interested, if, after the filing of the petition for dissolution, the lease is cancelled by vote of the directors of both companies."

It seems by the record in that case the only complaint made by the petitioners was the fact of the lease having been entered into fraudulently for the benefit of the second company. After the filing of the petition the board of directors of both companies met and cancelled the lease. This was followed by an answer to the petition setting up the fact

of such cancellation, and the whole question was then raised by demurrer to the answer. It is apparent by this answer that the whole and only cause of complaint had been removed, and for all that appears there were no business relations other than that between the two companies from which there might arise a conflict of interest. The Telegraph Company, in other words, was left in the same position by the cancellation of the lease as it was prior to its execution, without any acts or facts alleged showing any other or further relation in operation or management of the two lines or the exercise of control which might result in possible conflict between them. So, if in this case the only contention made by the petitioners rested upon the carrying out of the Westinghouse contract, and that was the sole and only relation that the two companies had with each other—that is, if they were to be treated in their relation simply, the local company as a producer of electricity and the Southwestern as the consumer—and even though such contract was fraudulently secured by the majority for the benefit of the Southwestern, yet if by the termination of such contract the two companies were restored to their former state, then we would have a case substantially parallel to the one above cited. But here in this case, as already suggested, it was the purpose of the majority in securing control of the local company to make it an integral part of its general system, and in pursuance of that policy relations of an important and grave character were constantly arising in which the interests of the two companies were antagonistic. Therefore, the relations between the two companies in the case

at bar are entirely different from the facts disclosed in the case above referred to.

But further, complainants do not rest their claim upon any one of the alleged material facts set forth in their petition, but rather upon all the facts taken together as tending to show the actual relation existing between these two companies and the attitude of the majority in the exercise of control in the local company. So I take it that the case in 119 Mass., *supra*, is not applicable to the facts disclosed in this case.

Now, going to the question of dividends on the preferred stock. I have referred to the passage of two resolutions by the board of directors at its special meeting in January, 1908. The first, as to the installation of new machinery, I have disposed of; the other, that of deferring dividends on preferred stock, will now be taken up. This resolution provided in terms "That the preferred stock dividends of this company due February 1, 1908, be deferred on account of the present financial condition also in consideration of the new machinery which the company is obliged to install at its power plant in order to take care of its present and increasing business."

Prior to the adoption of this resolution, on November 16, 1906, appears the first act of the board of directors with reference to the declaration of dividends on preferred stock. The act of the board at that time recited as follows:

"That a dividend of one and one-half per cent. on the preferred stock of the company is directed payable Feby. 1, 1907, to shareholders of record at the close of business on January the 20th, 1907, this dividend to be for the quarter ending February 1,

1907, to be paid by check of the company from funds to be placed in the hands of the treasury for that purpose prior thereto and to be signed by the treasurer."

On the same date is found the following resolution:

"*Resolved,* That a special deposit account known as the dividend account of this company be opened with the Western German Bank of Cincinnati, Ohio, and that the company immediately deposit to the credit of such account the sum required to pay the dividends declared at this meeting on the preferred stock of the company, and that thereafter beginning with the 20th day of January, 1907, the officers of this company are directed to deposit to the credit of such funds monthly an amount sufficient to accumulate in said funds the amount required for subsequent quarterly dividends until otherwise ordered by the board of directors."

Under the above resolution, passed November 16, 1906, dividends were paid quarterly for the year 1907, the dividend due November 1, of that year, being paid after the Southwestern had acquired a controlling interest in the company, and in January following the resolution first above noted, deferring the payment of dividends, was passed, and the majority of the board have ever since refused the payment of any dividend on preferred stock. The complainants charge that the earnings of the company have been sufficiently over and above the expense of operation and other proper charges, in the careful business management of the company, to more than liquidate the dividends claimed to be due from time to time, and

that the majority, in withholding dividends, was not justified on the ground that earnings were insufficient for that purpose, or that there would not be funds on hand for that purpose, if the direction of the board under the former resolution had been carried out, and they charge that the attitude of the majority in control of the company in this respect was prompted by a desire to build up the value of the common stock to the prejudice of the preferred stock and give the benefit of the earnings to the Southwestern.

And it is further charged by complainants that additional investments in the way of permanent improvements have been made and paid for out of the earnings of the company which are properly chargeable to capital account and which should have been paid for out of the proceeds of unsold bonds, and that in disbursing the earnings for such purpose and building up the capital account from the earnings rather than from the sale of bonds made for such purpose, the majority acted for the very purpose of repudiating the obligation of the preferred stock and enhancing the value of the common stock.

Upon the other hand, there is a contention on the other side that in the distribution of earnings of the company and in the application for the liquidation of bills arising for maintenance, improvements and betterments, the company had in many instances, prior to the time of the acquisition of stock by the majority, charged to capital account many thousands of dollars which ought to have been, in good business judgment, charged to maintenance, and if

this had been properly done, as contended by the majority, the profit of the company would not appear at any of the periods in question sufficient to warrant the payment of a dividend on any of the stock of the company.

The majority also contend that taking into consideration the character of its business and its contingent liabilities resulting from accidents and its obligations to the city in the way of street improvements and other contingencies, the amount of cash reserve at all times should not be less than $35,000, and that this reserve, with the unsold bonds, should be reserved to meet the contingencies of that character and to provide a proper working capital for the company; that to do so is to exercise a sound business judgment, not only to maintain the credit of the company, but practically the life of the corporation itself.

The larger part of the testimony in this case is taken up with the testimony of different witnesses testifying on this subject, and the balance sheet and schedule of receipts and disbursements, covering a period from the organization of the company to and including the year 1911, have been introduced, together with a complete analysis of the accounts of the company, covering practically the same period, by expert accountants, with criticisms upon various entries concerning the distribution and application of the earnings of the company from time to time during such period.

It is very apparent that the differences in policy as to the distribution of the earnings respectively advocated by the minority and majority arise and

grow out of their respective interests peculiar to the different classes of stock. It may be that the policy of the majority is the sounder one of the two —that is, the financial strength of the company would be enhanced by conserving all of its earnings for the purpose of distribution in betterments and cash reserve rather than distributing any part of them in dividends to the stockholders, yet the ultimate object of every corporation for profit is to distribute its surplus earnings, when consistent with good business management, among its stockholders according to their respective rights. Whether or not the court under the facts in this case, if that question were the only one to be determined, would order the board to make a dividend upon the preferred stock, might present a very serious question, but the determination of that question is merely incidental to the main issue herein involved, and therefore not necessarily material to the ultimate question presented by the whole record.

It does appear that up to the time of the actual exercise of control upon the part of the majority, dividends were paid upon the preferred stock as provided in the resolution of November 16, 1906, and that funds necessary to pay the same were caused to be deposited in the depository designated for that purpose from time to time. The dividend due February 1, 1908, was deferred on account of the general financial condition and the probable expense of the installation of additional power, but no further action was taken by the board that appears of record for deferring payments of subsequent dividends, nor does the record disclose any

reason therefor.    The board simply failed to act, and it was this failure upon the part of the majority, which in effect finally resulted in refusal to distribute earnings to the preferred stockholders, that laid most of the foundation for the troubles and dissensions between the two classes of stockholders.

It is claimed by the petitioners that the attitude of the majority in withholding dividends under the circumstances was not that dividends might properly have been paid, but because the majority intended a repudiation of any preferential rights specified in the terms of the contract of the preferred stock.  If dividends were deferred by the act of the majority in the exercise of a sound business judgment, unaccompanied with any other action or motive indicating a purpose to secure advantage over the minority, the conservation of the earnings under such circumstances would not lay the foundation for complaint in this action or even in a direct action to compel a distribution of the earnings, but if, back of the act itself, there were a motive and purpose to ignore and repudiate the claimed preferential contract of the minority and the deferring of dividends was simply a means employed to effect repudiation, then the act itself should be closely scrutinized and every act and inference should be resolved against the majority for the protection of the minority.   In order to ascertain the attitude of the representatives of the Southwestern on the local board toward the preferred stock it is not necessary to speculate on the motives that may have actuated their conduct in regard to other transactions hereinafter referred to, for it appears by the

record that the Southwestern interests, holding common stock, openly assert that the so-called preferred stock is not entitled to any preference, either by way of dividend or otherwise, for by the joint answer of the four representatives of the Southwestern on the local board of directors in the case of *Kleybolte & Co. et al.* v. *The Mansfield Railway, Light & Power Company,* in which case it is sought by mandatory order to compel the board to declare a dividend on the preferred stock, and which answer was introduced as a part of the evidence in this case, they say: "They admit that said stock aforesaid, 3,500 shares are called and denominated preferred stock, and 6,500 shares are called and denominated common stock, but they deny that any of said stock is entitled to any preference of any kind over and above the common stock."

By the clear and unmistakable language of this answer the majority are saying to that class represented by the minority in the management of this company, "Any right you claim by way of preference on stock held by you will be ignored, you will be relegated simply to the rights of common stockholders, and as to assets and dividends your holdings will be treated by us as such."

As I have heretofore intimated, there is no evidence in this record adduced for the purpose of this hearing that would warrant a finding to sustain the claim of the majority in this respect. *Prima facie,* in determination of the ultimate question here the claim of the preferred stockholders as such must be sustained, whatever claim may be asserted by the majority on the question of final distribution

of the proceeds of the assets of the company among
its stockholders. Here then, we have this situation
—a public corporation engaged in a fairly prosper-
ous business, capable by efficient management of
producing earnings sufficient to take care of all
necessary operating expenses, meet interest upon
its bonds, provide for additional improvements
each year as provided by the terms of its mortgage
to the bondholders, discharging in fact all its obli-
gations as they severally fall due, and enhancing
the value of the security to its bondholders, and
over and above all of such charges showing a net
profit of from $20,000 to $30,000 per year, with a
valuable plant and franchise, with no question
raised as to its credit and with $58,000 of unsold
bonds in its treasury applicable to any needed per-
manent improvements and betterments as occasion
might arise. But notwithstanding this most valu-
able situation, it clearly appears from the evidence
that the plant of the company is practically without
any reserve power, that in case of serious break-
down or accident the company is left helpless to
move its cars, necessarily impairing its revenues
and discommoding the public, and in many in-
stances not rendering the service which it would be
able to render if proper means were employed out
of the credit and resources now available to provide
a proper and complete equipment.

On the one side of this situation stand the pre-
ferred stockholders not objecting to any reasonable
improvement but saying that permanent improve-
ments which are properly chargeable to capital
should be paid for from the proceeds of bonds in

the treasury for that purpose. On the other side, the common stockholders, represented by a majority in interest, say that such improvements are and should properly be paid for out of the earnings of the company and the unsold bonds kept intact. If the policy of the preferred stockholders be adopted, it would enhance the possibility of dividends to them; if the policy of the majority be put into effect, it would enhance the value of the common stock and would substantially in the end accomplish their purpose of equalizing the value of the common stock with the preferred stock.

This situation presents what might be properly called an irrepressible conflict between these different interests, a contention which the record shows in several instances has brought the various phases of the contention into court, finally culminating in this action, a situation in which the preferred stockholders watch with jealous care every act of the majority and the majority exercising every power through its control to carry out what they claim is a sound business policy. Whatever may be the merits or demerits of the claim of the respective parties, it is evident that this contention bodes no good to the success of the company; that its very effect is to retard improvement, affecting the freedom of the board and preventing it from acting upon any essential matters pertaining to management without embarrassment, bias or prejudice. In the meantime, perhaps, needed improvements are taken care of by mere makeshifts, the service is not what it should be and the public itself becomes a sufferer to a more or less extent. This

condition it would seem would almost warrant an action in *quo warranto* on behalf of the state to dissolve the corporation; for if stockholders by their attitude toward each other create such a contention between themselves that conditions arise therefrom that the corporation having a public duty to perform is unable to perform such duty reasonably, it would seem the state would have a right to interfere to the extent of compelling harmonious action for the benefit of the public or of dissolving the corporation itself.

Internal dissensions between the stockholders which are of that grave and serious character which naturally interfere with or retard its management in the legitimate prosecution of its business or the reasonable discharge of its duties to the public, necessarily affect the interests of all the stockholders of the corporation to their prejudice, which would warrant the court under the statute to dissolve the corporation.

So, without determining the merits or demerits of the claim of the minority or majority respectively as to whether the financial condition of the company would or would not justify the payment of dividends, it is by reason of other considerations referred to apparent that it is to the interests of the stockholders that the corporation be dissolved. The house is hopelessly divided against itself, the breach is too wide, the interests too several and conflicting, and the control so positive and subversive to the larger interest represented in that control that possibility of harmonious action on any well-defined policy for the benefit of the company

seems remote and uncertain, threatening the interest of the stockholders as a class, impairing the value of their stock and indirectly affecting the service which the company owes the public.

Therefore, it clearly appears to the court that the best interests of the stockholders of this corporation would be conserved by a dissolution of the corporation.

This then brings us to the next question, that is, Would the dissolution of this corporation be injurious to the public interest? A distinction might be made as between a purely private corporation and a *quasi*-public corporation—that is, one engaged in business for private gain to its members without any responsibility to the public in exercising its charter rights, and that of the corporation which, while operated for private gain, yet, in furnishing its service, owes directly a duty to the public. But notwithstanding this distinction, I take it that the same facts that would warrant a dissolution of a private corporation would apply with equal force to a *quasi*-public corporation, except that if it were detrimental to the public, under the limitations provided by the statute, no dissolution could be made. In this case, however, that question is not of controlling force, for the reason that if a dissolution were ordered the rights of the public would be protected by the appointment of a receiver, with full power and authority to preserve and operate the property and maintain the service until it passed under an order of sale to purchaser, such purchaser taking all the franchises and rights, good will and property which the present company now possesses and enjoys.

This case upon its presentation was quite fully argued orally by counsel, and subsequently exhaustive briefs were furnished by counsel to the court upon the various questions involved in this controversy. The court has endeavored to make a very thorough investigation of the authorities cited by the respective counsel, but inasmuch as the question to be determined was one more of fact than of law, very little if any reference has been made in this opinion to the several cases cited or to their application to the case at bar. To have done so would simply have added length to this opinion, which perhaps is longer than necessary to indicate the basis upon which the decree in this case is made, but, anyhow, the analysis naturally followed in the development of the several questions raised by the record and argument of counsel.

For the reasons above stated a decree may be taken dissolving the corporation, and upon its dissolution a receiver will be appointed and the costs of this proceeding will be adjudged against the company. The stenographer and master will be allowed fees in the amount recommended by the master, the same to be taxed as part of the costs.