FILED
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| LAZY S RANCH PROPERTIES, LLC, an Oklahoma limited liability company,<br><br>Plaintiff - Appellant,<br><br>v.<br><br>VALERO TERMINALING AND DISTRIBUTION COMPANY, a Delaware corporation; VALERO PARTNERS OPERATING CO. LLC, a Delaware limited liability company; VALERO PARTNERS WYNNEWOOD, LLC, a Delaware limited liability company,<br><br>Defendants - Appellees. | Nos. 23-7001 & 23-7020 |

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:19-CV-00425-JWB)**

_____

David Phillip Page, Environmental Energy & Natural Resources Advocates, PLLC, Tulsa, Oklahoma (Robert W. Coykendall of Morris Laing Law Firm, Wichita, Kansas, with him on the briefs), for Plaintiff - Appellant.

James F. Bennett of Dowd Bennett, LLP, St. Louis, Missouri (Matthew E. Johnson and Kimberly Berve of Dowd Bennett, LLP, Denver, Colorado, with him on the brief), for Defendants - Appellees.

_____

Before **PHILLIPS**, **KELLY**, and **ROSSMAN**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

In this diversity case, Plaintiff-Appellant, Lazy S Ranch Properties, LLC

("Lazy S") appeals from the district court's grant of summary judgment and denial of

post-judgment relief in favor of Defendants-Appellees, Valero Terminaling and

Distribution Company, Valero Partners Operating Co., LLC, and Valero Partners

Wynnewood, LLC (collectively "Valero").[1]  Lazy S brought several claims against

Valero, claiming that its pipeline leaked.  This court has jurisdiction under 28 U.S.C.

§ 1291.  We reverse the district court's grant of summary judgment and denial of post-

judgment relief in part on Lazy S's claims for private nuisance, public nuisance, and

negligence per se, and we affirm on all other claims.  We affirm the district court's grant

of summary judgment in part despite Lazy S's claim that discovery was outstanding.

## Background

### A.    Factual Background

Lazy S runs cattle operations on 6,150 acres of property located in the Arbuckle

Mountains of Oklahoma.  IX Aplt. App. 86, 144.  The ranch sits atop a 500-square-mile

aquifer (the Arbuckle-Simpson aquifer) which feeds numerous freshwater springs

throughout the region, including Tulip Springs, a water-source on the ranch.  IV Aplt.

---

[1] See Lazy S. Ranch Props., LLC v. Valero Terminaling & Dist. Co., No. 19-CV-425-JWB, 2022 WL 17553001 (E.D. Okla. Dec. 7, 2022) (granting summary judgment); Lazy S. Ranch Props., LLC v. Valero Terminaling & Dist. Co., No. 19-CV-425-JWB, 2023 WL 2382725 (E.D. Okla. Mar. 2, 2023) (denying motion to alter or amend judgment).

App. 256; IX Aplt. App. 86.  Pipelines beneath the ranch transport hydrocarbons.  At issue in this case is Valero's Wynnewood Pipeline, which was installed in 1974 and carries gasoline and diesel fuel (refined petroleum products).  IIIA Aplt. App. 80; IV Aplt. App. 256.  Adjacent to Valero's pipeline lie two pipelines referred to as the Blue Knight pipelines.  IX Aplt. App. 87.  Between 1948 and 2008, an 8-inch Blue Knight pipeline carried refined petroleum products ("old Blue Knight pipeline").  Id.  After carrying crude oil between 2008 and 2013, Blue Knight abandoned the 8-inch pipeline and installed an adjacent 12-inch pipeline ("new Blue Knight pipeline").  Id.  Another pipeline under the ranch (the Cool Creek Pipeline) carries telecommunication lines.[2]  Id.

In addition to the pipelines under Lazy S Ranch, Valero's experts identified several other potential sources of contamination in the surrounding area: lubricating oils from windmills, cooling oils from an electrical gathering complex, transformers on radio towers, nearby highways (Interstate 35, US-77), a large pile of asphalt millings, and another ranch with outbuildings and equipment.  Aplee. App. 519–21.  Valero's expert also noted the presence of radio relay towers with underground storage tanks containing refined petroleum products — though he acknowledged most are powered by propane today.  IV Aplt. App. 230.

---

[2] Valero's expert Bert Smith reported that the prior owner of the ranch granted Cool Creek Properties, LLC an easement and right-of-way for telecommunication purposes and for "the transportation of liquids and gaseous substances" in 2017.  Aplee. App. 517.  In a separate portion of his report, Mr. Smith stated that the Cool Creek Pipeline has been converted to telecommunications service.  Aplee. App. 491.  In their briefs, neither party maintains that the Cool Creek Pipeline was actively transporting refined petroleum products when the contamination was discovered.

In 2018, Robert Charles "Cinco" Roos, a representative of the ranch, noticed a diesel fuel odor emanating from a cave near Tulip Springs. V Aplt. App. 9; VII Aplt. App. 260–62. And his father, Robert Charles Roos IV, stated that if a person stood there long enough, "it will give you a headache and you can taste it in your mouth." VII Aplt. App. 176. To Lazy S's expert, Dr. Fisher, the smell was "clearly a hydrocarbon odor." V Aplt. App. 92. The smell was so strong that Geologist Kevin Blackwood feared igniting a lighter within the cave would "blow up the subsurface[.]" VI Aplt. App. 102. In his deposition, Mr. Blackwood also testified that the odor (akin to paint thinner and gasoline) caused him and his friends to have headaches. Id. at 99. And a local spelunker, Dennis Thompson, was unable to map the cave because the gas fumes prevented him from staying "in there long enough to do anything." VII Aplt. App. 291–92.

Fearing pollution, Lazy S hired several experts to collect samples of soil, surface water, groundwater, spring water, and air at the ranch. IX Aplt. App. 88–89. These experts tested the samples for the presence of refined petroleum products and found trace amounts in each. Id. at 89–91. Valero conducted its own investigation and provided a comparison between the maximum contaminant levels found in the samples and thresholds published by various regulatory bodies. Id. at 105–07. These thresholds set out the lowest levels at which adverse health effects may occur. Id. at 105. Valero's expert, Dr. Coleman, opined that the soil and water were acceptable for residential use (the most conservative exposure scenario). Aplee. App. 718. Similarly, she found that the groundwater could be used without restrictions. Id.

4

### B.     Procedural History

Lazy S filed its complaint, alleging claims for: (1) negligence and res ipsa loquitur, (2) negligence per se, (3) trespass, (4) private nuisance, (5) public nuisance, (6) unjust enrichment, (7) constructive fraud, (8) indemnification, (9) alter ego, (10) amalgamation or single enterprise, and (11) punitive damages.[3]  I Aplt. App. 45–57. Lazy S moved for partial summary judgment claiming that Valero contaminated its property and caused injury.  I Aplt. App. 148–165.

Valero moved for summary judgment, arguing that its pipeline was not leaking and that Lazy S could not demonstrate injury from the de minimis presence of hydrocarbons on the ranch.  IIIA Aplt. App. 29–46.  Lazy S responded that Oklahoma law prohibits even trace amounts of contamination, Valero's pipeline was leaking, and Valero's leaking pipeline caused a legal injury to the ranch.  V Aplt. App. 28–42.

In recognizing that Oklahoma law requires a cognizable injury for each claim, the district court analyzed Lazy S's tort claims (claims one through seven) together.  IX Aplt. App. 93–94.  The court rejected several of the statutes and regulations that Lazy S proffered as a basis for its claims, including Okla. Admin. Code § 165:10-7-5.  IX Aplt. App. 95–99.  Section 165:10-7-5 provides that pipeline companies "shall at all times conduct their operations in a manner that will not cause pollution."  The court rejected

---

[3] The district court analyzed Lazy S's claims for indemnification, alter ego, and amalgamation or single enterprise separate from its tort claims.  IX Aplt. App. 115–16. Nowhere in its opening brief does Lazy S challenge the district court's grant of summary judgment on those grounds.  "Issues not raised in the opening brief are deemed abandoned or waived."  Tran v. Trs. of State Colls. in Colo., 355 F.3d 1263, 1266 (10th Cir. 2004) (citation omitted).  These claims are therefore waived.

5

this regulation because it merely prohibited pollution in a general sense and failed to expressly define pollution.  IX Aplt. App. 97–98.

Instead, the district court applied Okla. Stat. tit. 27A, § 2-6-105(A) to Lazy S's case.  IX Aplt. App. 98–100.  Section 2-6-105(A) prohibits pollution "of any waters of the state" and the placement of wastes in any location "likely to cause pollution of any air, land or waters of the state."  The statutory scheme defines pollution as:

> [T]he presence in the environment of any substance, contaminant or pollutant, or any other alteration of the physical, chemical or biological properties of the environment or the release of any liquid, gaseous or solid substance into the environment in quantities which are or will likely create a nuisance or which render or will likely render the environment harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, or to property[.]

Okla. Stat. tit. 27A, § 2-1-102(12).  The district court applied this definition because Oklahoma courts have applied it in similar cases.  IX Aplt. App. 98–99.  It concluded that the statute's plain language refuted Lazy S's position that Oklahoma law contained no minimum threshold for actionable pollution.  Id. at 99–100.  Instead, to demonstrate legal injury, Lazy S needed to establish pollutants "in sufficient quantities to constitute a nuisance or to render the environment harmful, detrimental, or injurious."  Id. at 100.  The district court concluded that Lazy S met none of these requirements.  Id. at 109.  First, relying on Valero's comparison of the soil, water, and air samples to regulatory safety levels, the court reasoned that the contaminant levels on the ranch were too low to give rise to a nuisance or environmental harm.  IX Aplt. App. 105.  Most samples were far below the levels at which adverse health effects may occur.  Id. at 105–08.  And Lazy

6

S did not contest the sample concentrations or the regulatory thresholds. The district court noted that when an Oklahoma Water Resources Board (OWRB) permit application asked about "all known or suspected contamination," Lazy S replied "None[,]" and that residents, workers, and cattle continued to drink the ranch water (cattle drink from Tulip Springs). Id. at 108. The court summarily dismissed the periodic reports of the odor because it found they were insufficient to establish a nuisance claim under Oklahoma law. Id.

Second, assuming a legal injury occurred, the court addressed causation and reasoned that Lazy S presented insufficient evidence that Valero was the cause. IX Aplt. App. 109–10. Lazy S failed to definitively show a single leak other than the visible drip on a mechanical union nearly two miles south of Tulip Springs. Id. at 110. And Lazy S could not create an inference of causation using res ipsa loquitur because it failed to establish that Valero "exclusively controlled the instrumentality that caused the injury" pursuant to Oklahoma law. Id. at 110–11 (quoting Harder v. F.C. Clinton, Inc., 948 P.2d 298, 303 n.12 (Okla. 1997)). Lazy S failed to rule out other sources of contamination in the area, including the old Blue Knight Pipeline, the radio relay towers, highways, and the Arbuckle-Simpson aquifer, which might carry contaminants from elsewhere in its 500-square-mile span. Id. at 113–14. Without the doctrine of res ipsa loquitur, the court concluded that causation would be far too speculative for Lazy S to succeed. Id. at 114–15. Accordingly, the court granted summary judgment in favor of Valero on all claims and denied Lazy S's motion for partial summary judgment. Id. at 121.

Lazy S filed a motion to alter or amend pursuant to Federal Rule of Civil Procedure 59(e).  IX Aplt. App. 127–64.  In denying the motion, the court clarified its rejection of Lazy S's argument regarding the odor, noting that Lazy S referenced headaches only once, and this testimony merely suggested that prolonged exposure can cause a headache, not that multiple people have actually suffered from headaches, stress, or illness from the odor.  Id. at 203, 210.  To the extent the summary judgment record reflected otherwise, the court found Lazy S's briefing on the issue inadequate.  Id. at 203.  Lazy S appealed from the district court's grant of summary judgment, id. at 165–66, and from the district court's denial of its motion for reconsideration, id. at 211–12.  This court consolidated the appeals.

## Discussion

Lazy S presents two main arguments on appeal.  First, it argues the district court erred in granting summary judgment because the court misinterpreted Oklahoma law to require a minimum level of contamination to establish injury.  Aplt. Br. at 18–19.  Further, it argues that the court applied the summary judgment standard incorrectly by substituting its opinion for the opinion of the experts and other witnesses and failing to view the evidence in the light most favorable to Lazy S.  Id. at 18.

Second, it argues the district court erred in granting summary judgment because discovery was outstanding on the issue of pipeline monitoring by Valero indicative of how much refined product is lost in transit.  Aplt. Br. at 19–20.  Under Federal Rule of Civil Procedure 56(d), Lazy S argues Valero failed to provide further documentation

regarding the monitoring, and the court abused its discretion by not deferring ruling until after Lazy S obtained that documentation.  Id. at 40–42.

We begin by considering the district court's grant of Valero's motion for summary judgment on Lazy S's tort claims for private nuisance, public nuisance, negligence per se, and negligence.  We conclude the section by analyzing whether Lazy S presented a genuine issue of material fact as to causation.

## A.     Motion for Summary Judgment

We review the grant of summary judgment de novo, using the same standard as the district court.  Chase Mfg., Inc. v. Johns Manville Corp., 84 F.4th 1157, 1168 (10th Cir. 2023).  We generally review only the materials adequately brought to the district court's attention and considered by the district court.  Fed. R. Civ. P. 56(c)(3).  Thus, when a party fails to present specific facts by reference to exhibits and the existing record, "we will not reverse a district court for failing to uncover them itself."  Teets v. Great-West Life & Annuity Ins. Co., 921 F.3d 1200, 1228 (10th Cir. 2019) (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998)); see Fed. R. Civ. P. 56(e)(3).  While an affidavit supporting or opposing a motion must "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4), it need not be submitted "in a form that would be admissible at trial[,]"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The movant bears the initial burden to show the absence of a genuine issue of material fact.  Id. at 323.  If successful, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 250 (1986). The nonmovant must show more than a "scintilla of evidence" in support of its position, instead, the evidence must be sufficient for a jury to reasonably find for the nonmovant. Id. at 252. If there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670. "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." Id.

Perhaps most importantly, a court views the facts and their reasonable inferences in the light most favorable to the nonmovant. Id. While these inferences must be plausible, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–88 (1986), the court should not weigh the evidence, make credibility determinations, or assess the credibility of conflicting testimony at the summary judgment stage, Forth v. Laramie Cnty. Sch. Dist. No. 1, 85 F.4th 1044, 1052 (10th Cir. 2023). Only when a specific set of facts is "blatantly contradicted by the record, so that no reasonable jury could believe it" can the court choose to disregard those facts. Norwood v. United Parcel Serv., Inc., 57 F.4th 779, 790 (10th Cir. 2023).

We apply Oklahoma state law to assess Lazy S's tort claims at summary judgment. See Butler v. Daimler Trucks N. Am., LLC, 74 F.4th 1131, 1140 (10th Cir. 2023). In its summary judgment order, the district court analyzed Lazy S's tort claims together, because each claim necessarily required a "legal injury." IX Aplt. App. 93–94. In doing so, the district court relied upon a definition of pollution that requires a finding

10

of "a nuisance" or contamination that "render[s] the environment harmful, detrimental, or injurious." Id. at 100; Okla. Stat. tit. 27A, § 2-1-102(12). It rejected Lazy S's contention that Oklahoma law sets no minimum threshold for pollution. IX Aplt. App. 99–100.

On appeal, Lazy S renews its argument that "any deposition of product outside of the easement is *per se* wrongful." Aplt. Br. at 34. Because we find that Lazy S presented sufficient evidence to create a genuine issue of material fact as to nuisance, we choose not to address this argument. To the extent that Lazy S relies upon the quantities of contaminants found throughout the samples of ranch soil and water to support its claims, we find that these contaminants, on their own, do not create any genuine issues of material fact. However, we note that Valero's expert, in summarizing his expert report, found that "[t]he chemical data available indeed show that Tulip Springs has intermittently shown trace amounts of diesel fuel and gasoline[.]" I Aplt. App. 230. That undisputed fact is one of many that leads to our conclusion.

## 1. The district court erred in granting summary judgment on Lazy S's nuisance and negligence claims.

By combining Lazy S's tort claims under legal injury, the district court confused the analysis. A legal injury is necessary for all claims, but what constitutes a legal injury will be different based on the elements of each tort. Lazy S's primary tort claims are for negligence and res ipsa loquitur[4], negligence per se, private nuisance, and public nuisance. We begin with Lazy S's injury under the law of nuisance.

---

[4] On appeal, Lazy S does not raise the doctrine of res ipsa loquitur. It is waived. See Tran, 355 F.3d at 1266.

### a. Nuisance

Oklahoma law defines nuisance as an unlawful act or omission which "[a]nnoys, injures or endangers the comfort, repose, health, or safety of others[.]" Okla. Stat. tit. 50, § 1.[5] A public nuisance affects "an entire community or neighborhood, or any considerable number of persons," id. § 2, and a private nuisance is any nonpublic nuisance, id. § 3.

We analyze Lazy S's private nuisance and public nuisance claims together. Okla. Stat. tit. 27A, § 2-6-105(A) mandates that "pollution" of any waters of the state is a public nuisance. Meinders v. Johnson, 134 P.3d 858, 867 (Okla. Civ. App. 2005) (emphasis added). And the statute defines pollution as the release of substances "into the environment in quantities which are or will likely create a nuisance[.]" Okla. Stat. tit. 27A, § 2-1-102(12) (emphasis added). Thus, § 2-1-102(12) classifies the creation of a nuisance by the release of substances into the environment as pollution, and under § 2--6-105(A), the existence of this type of pollution gives rise to a public nuisance. Based on a logical reading of the statutes, the finding of a private nuisance based on the unlawful release of substances into the environment necessitates the finding of a public nuisance also.

---

[5] We note that Oklahoma courts interpret Okla. Stat. tit. 50, § 1 as a generic definition of nuisance incapable of abrogating the common law requirement that a plaintiff show "substantial interference with the use and enjoyment of real property[.]" Taylor v. Delaware Cnty. Solid Waste Tr. Auth., 503 P.3d 1216, 1221 (Okla. Civ. App. 2021).

A nuisance arises where there is substantial interference "with the ordinary comforts of human existence." Laubenstein v. Bode Tower, L.L.C., 392 P.3d 706, 709 (Okla. 2016) (quoting Kenyon v. Edmundson, 193 P. 739, 741 (Okla. 1920)). Trifling annoyances or discomforts are insufficient. Id. Oklahoma courts have repeatedly held that foul odors constitute a nuisance. In Kenyon, the Oklahoma Supreme Court found a nuisance where a stench emanating from a desiccating plant caused locals to have nausea, loss of appetite, and serious discomfort. 193 P. at 740–41. Similarly, in Boudinot v. State ex rel. Cannon, the Oklahoma Supreme Court found a nuisance where a woman with nearly 40 cats caused a severe, offensive, and unbearable stench affecting her neighbors. 340 P.2d 268, 270 (Okla. 1959). One family even abandoned eating on their patio. Id.

While we agree that "[t]he law does not allow relief on the basis of an unsubstantiated phobia[,]" see IX Aplt. App. 105 (citing Rockwell Intern. Corp. v. Wilhite, 143 S.W.3d 604, 627 (Ky. Ct. App. 2003)), this was no unsubstantiated phobia. Wilhite is illustrative on this point. There, the landowners stopped using their property only after discovering the existence of minute quantities of contaminants. Wilhite, 143 S.W.3d at 627. If the Roos family had stopped using their land based on the sampling results alone, Wilhite might be more persuasive. But the Roos family discontinued their use, in part, because of the headache inducing smell emanating from Tulip Springs.

The district court disregarded Mr. Roos's testimony that he has foregone water sales and prohibited others from recreating on the ranch as unsupported by scientific

13

evidence and irrelevant to injury. IX Aplt. App. 104–05. Additionally, it found that Lazy S never notified a regulatory agency of the contamination, workers on the ranch continue to drink the water through a filter, and cattle continue to graze on the property. Id. at 108. While these latter factors may undercut Lazy S's case, we believe Mr. Roos's testimony remains relevant given our view of what constitutes harm under the applicable law.

The district court also downplayed the evidence supporting the strong odor emanating from the cave near Tulip Springs and the resulting headaches. IX Aplt. App. 203. It failed to view reasonable inferences in favor of Lazy S when it disregarded Mr. Roos's testimony regarding the headache he suffered near Tulip Springs, concluding that this testimony merely suggested that prolonged exposure can cause a headache, not that multiple people have actually suffered from headaches, stress, or illness from the odor. Id. But it is unlikely Mr. Roos could testify to the possibility of a headache without experiencing one himself. The reasonable inference to draw from this testimony is that the odor was so strong that it caused Mr. Roos to suffer a headache.

Further, the district court concluded that plaintiff's single reference to reports of headaches by Mr. Roos, V Aplt. App. 32 (citing VII Aplt. App. 176 (Roos IV Depo., 176:10–20)), failed to sufficiently identify the evidence of the odor and headaches in its response to Valero's motion for summary judgment. IX Aplt. App. 203. Valero also argues that Lazy S failed to properly present this claim to the district court. See Aplee. Br. at 36–37. Both are incorrect. In Plaintiff's Statement of Disputed Facts, V Aplt. App. 7–26, Lazy S's response to paragraph nine presents several record references to

14

testimony by multiple individuals attesting to the strong odor on the property, id. at 9–10, and one record reference cited in the response points out that Kevin Blackwood suffered headaches along with "several of [his] friends," id. at 10 (citing VI Aplt. App. 99 (Blackwood Depo., 160:1–10) ("[Y]eah, everybody got headaches, it was pretty bad")). Lazy S attached the referenced excerpts, including Mr. Blackwood's deposition, to the summary judgment response. Aplt. Reply Br. at 19–20. While Lazy S's motion opposing summary judgment does not explicitly declare that Kevin Blackwood and his friends suffered headaches at Tulip Springs, the citation to the record was sufficient, particularly in light of expert opinion indicating reports of headaches. See I Aplt App. 219–20. This expert report, prepared by Dr. Fisher, was repeatedly referenced in Lazy S's motion opposing summary judgment and the district court's order granting summary judgment. Lazy S argued that the foul odor emanating from Tulip Springs supported its nuisance claim, and the district court was aware of the odor at summary judgment. It should have considered the cited deposition testimony.

Valero argues that the intermittent odor emanating from Tulip Springs is too insubstantial as a matter of law to constitute injury, relying on Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2009 WL 3698419, at *6 (S.D. Ohio Nov. 4, 2009). Aplee. Br. at 38. In that out-of-circuit case considering Ohio law, the court rejected the landowner's claim of injury based on periodic oil, gasoline, and diesel odors, because these incidents were "too insubstantial as a matter of law[.]" Baker, 2009 WL 3698419, at *6. But the reports of odors in that case never rose to the severity of those here. Id. Valero's reliance on Baker is misplaced.

15

Viewing all reasonable inferences in the light most favorable to Lazy S, there is sufficient evidence to warrant a trial on the existence of legal injury under state law private nuisance.  This evidence includes (1) the numerous reports of an odor emanating from Tulip Springs (strong enough to give Mr. Blackwood pause before igniting a lighter and strong enough to prevent Mr. Thompson from mapping the cave), (2) the headaches suffered by Mr. Roos, Mr. Blackwood, and Mr. Blackwood's friends, and (3) the changes in behavior by the Roos family as a result of the odor.  Moreover, under Okla. Stat. tit. 27A, §§ 2-6-105(A) and 2-1-102(12), Lazy S presented sufficient evidence showing the existence of a genuine issue of material fact as to legal injury under the law of public nuisance.

### b.  Negligence and Negligence Per Se

Ordinarily, to maintain a prima facie negligence claim, a plaintiff must demonstrate duty, breach, and proximate cause.  Snow v. TravelCenters of Am. LLC, 527 P.3d 741, 747 (Okla. Civ. App. 2022).  Negligence per se allows a party to "substitute statutory standards for parallel common law, reasonable care duties."  Howard v. Zimmer, Inc., 299 P.3d 463, 467 (Okla. 2013).  Thus, when the court adopts statutory standards, a violation of the statute constitutes negligence per se, allowing the case to proceed past duty and breach to causation and damages.  Id.  To qualify as negligence per se, the plaintiff must demonstrate that the claimed injury was caused by a violation of the statute and that the statute was designed to prevent the claimed injury and protect the class of injured people.  Id.

16

On summary judgment, Lazy S presented five separate grounds for its negligence per se claim: (1) Okla. Const. art. 2, § 23; (2) Okla. Admin. Code § 165:10-7-5; (3) Okla. Admin. Code § 785:45-1-2; (4) Okla. Stat. tit. 27A, § 2-6-105(A); and (5) Okla. Stat. tit. 82, § 1084.2(1).  V Aplt. App. 38–39.  The district court rightly disposed of Lazy S's claims under the Oklahoma Constitution, Okla. Admin. Code § 785:45-1-2, and Okla. Stat. tit. 82, § 1084.2(1).[6]  But further analysis is necessary under Okla. Admin. Code § 165:10-7-5 and Okla. Stat. tit. 27A, § 2-6-105(A).  To determine whether Lazy S presented a genuine issue of material fact as to legal injury under these statutes, we must also determine whether each statute applies for purposes of negligence per se and whether sufficient evidence exists for a rational jury to conclude that Lazy S actually breached the applicable statute.

### i.  Okla. Stat. tit. 27A, § 2-6-105(A)

We start with § 2-6-105(A), which prohibits pollution.  The definition of pollution in § 2-1-102(12) requires a finding of a nuisance or environmental harm to successfully prove a violation of the statute.  But we must determine its application for negligence per se purposes.  Section 2-6-105(A) prevents pollution of any waters of the state.  The

---

[6] We agree with the district court that Lazy S failed to adequately brief its claims under the Oklahoma Constitution in its opposition to Valero's motion for summary judgment.  IX Aplt. App. 197–99.  As for Okla. Admin. Code § 785:45-1-2 (revoked 2023) and Okla. Stat. tit. 82, § 1084.2(1), both provisions are merely definitions of pollution.  Because we find that Okla. Admin. Code § 165:10-7-5 and Okla. Stat. tit. 27A, § 2-6-105(A) already contain their own definitions of pollution, Okla. Admin. Code § 785:45-1-2 and Okla. Stat. tit. 82, § 1084.2(1) are irrelevant to the rest of our analysis.  See Oliver v. City of Tulsa, 654 P.2d 607, 611 (Okla. 1982) ("Where a statute contains its own definition of a term used therein, the term may not be given the meaning in which it is employed in another statute[.]").

17

statute's declaration of policy states that it is "public policy" "to provide that no waste or pollutant be discharged into any waters of the state or otherwise placed in a location likely to affect such waters[.]" Okla. Stat. tit. 27A, § 2-6-102. It clearly intends to prevent the injury alleged here — Valero's contamination of the streams and springs of the ranch. Further, we previously recognized that this statute may impose a duty to prevent pollution under Oklahoma law. See BP Pipelines (N. Am.) Inc. v. C.D. Brown Const., Inc., 473 F. App'x 818, 828 (10th Cir. 2012) (citing Okla. Stat. tit. 27A, § 2-6-105(A)) (unpublished).[7] Thus, the statute applies for negligence per se purposes.

As to whether there is sufficient evidence of a breach: as discussed above, Lazy S presented sufficient evidence to create a genuine issue of material fact as to nuisance. And the statute requires a finding of nuisance or environmental harm to show a breach. Thus, Lazy S can show a genuine issue of material fact as to whether Valero breached § 2-6-105(A).

### ii. Okla. Admin. Code § 165:10-7-5

Okla. Admin. Code § 165:10-7-5 provides that pipeline companies "shall at all times conduct their operations in a manner that will not cause pollution." The court concluded — wrongly — that this section merely prohibited pollution in a general sense because it fails to expressly define "pollution." IX Aplt. App. 98. But the regulatory scheme does, in fact, define "pollution" as the contamination of fresh water or soil "by

---

[7] Specifically, we recognized that the defendant may have owed a duty to the State of Oklahoma. While we have not expressly recognized that this statute imposes a duty owed to a private plaintiff, we have acknowledged that a landowner may pursue a claim under the statute. See Moore v. Texaco, Inc., 244 F.3d 1229, 1231 (10th Cir. 2001).

salt water, mineral brines, waste oil, oil, gas, and/or other deleterious substances . . . used in connection with . . . transporting . . . oil or gas within the State of Oklahoma." Okla. Admin. Code § 165:10-1-2. Oklahoma courts have used this definition in applying § 165:10-7-5. See Union Tex. Petroleum Corp. v. Jackson, 909 P.2d 131, 139 n.13 (Okla. Civ. App. 2009). The district court erred in concluding that § 165:10-7-5 does not apply. Lazy S did not include the regulatory definition in its response to Valero's MSJ, nor in its brief to this court, but a reviewing court must apply the correct law. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

Thus, § 165:10-7-5 is applicable to Lazy S's negligence per se claim. The regulatory scheme was "promulgated in furtherance of the public policy and statutory laws of the State of Oklahoma to prevent the waste of oil and gas, . . . and to prevent pollution." Okla. Admin. Code § 165:10-1-1. Thus, it is aimed at preventing the injury claimed by Lazy S — pollution on the ranch caused by the Wynnewood pipeline. Moreover, the Oklahoma Supreme Court has seemingly approved the application of the Oklahoma Administrative Code for negligence per se purposes. In Farris v. Masquelier, it approved the inclusion of a Code provision pertaining to streamflow interference because the alleged interference was "the very heart of the [plaintiffs'] negligence per se claim." 524 P.3d 942, 950 (Okla. 2022). Similarly, we find that this provision lies at the very heart of Lazy S's claim.

19

The issue remains whether Lazy S presented sufficient evidence to create a genuine dispute as to whether Valero breached Okla. Admin. Code § 165:10-7-5.  In other words, whether Valero "contaminat[ed]" the ranch's water or soil with "waste oil, oil, gas, and/or other deleterious substances[.]"  Id. § 165:10-1-2.  So far, Lazy S has presented sufficient evidence to create genuine issues of material fact as to whether Valero created a private nuisance and a public nuisance.  It has shown the presence of hydrocarbons on the ranch and the existence of a foul odor that has caused numerous headaches.  We think these regulations are broad enough to capture that evidence and serve as an additional basis for a claim under the doctrine of negligence per se.

To the extent that Lazy S asserts a claim for negligence apart from the doctrine of negligence per se, Lazy S failed to adequately present this argument to the district court and to this court.  Outside of its initial complaint, Lazy S has identified no duty imposed upon Valero other than those created by the statutes and regulations it cites.  Nor does Lazy S mention the applicable standard of care and whether Valero breached that standard of care.  Only in passing does Lazy S assert that Valero owes a "duty to exercise ordinary care[.]"  V Aplt. App. 38.  Because Lazy S has failed to adequately present its basic negligence claim, we find negligence per se adequately encompasses Lazy S's claims, and we do not recognize a separate negligence claim.

The dissent concludes that the district court properly granted summary judgment as to Lazy S's legal injury, relying primarily upon Valero's sampling data.  It attempts to characterize this case as a "pipeline leak case without a leaking pipeline[,]" despite the fact that this very pipeline leaked over 23,000 gallons of product south of the ranch in

20

2018. Aplee. App. 382. First, the dissent relies too heavily on the sampling data. Under Okla. Stat. tit. 27A, §§ 2-6-105(A) and 2-1-102(12), Lazy S can succeed by showing either pollution amounting to a nuisance or pollution rendering the environment harmful, detrimental, or injurious. Lazy S need not show both. The thresholds in Valero's sampling data are certainly relevant to environmental harm, but they are not essential to show a nuisance. The nuisance inquiry depends on a multitude of facts and circumstances. To dispose of Lazy S's claims based on the sampling data occupying "center stage" ignores the other evidence Lazy S has presented.

Second, the dissent erroneously concludes that "the remaining pieces of evidence are insufficient for a reasonable jury to find in Lazy S' favor." As noted, the headaches are relevant. In addition, the foul smell emanating from the cave was so strong that Mr. Blackwood and Mr. Thompson feared igniting a lighter would cause an explosion. Similarly, Mr. Thompson was unable to spend any significant time mapping the cave. Many others smelled the strong odor.

The dissent reiterates Valero's point that "an intermittent odor in one place on a 6,150-acre ranch" is insufficient to support a nuisance claim. While that position will undoubtedly be raised by Valero at trial, it is not our job to give outcome-determinative weight to such a comparison on summary judgment. Our analysis is limited to determining whether "a rational trier of fact could resolve the issue either way." Adler, 144 F.3d at 670. "If reasonable minds could differ as to the import of the evidence," we will not grant a motion for summary judgment. Anderson, 477 U.S. at 250–51. Only when the evidence "is so one-sided that one party must prevail as a matter of law" will

21

we bypass the jury.  Id. at 251–52.  That is simply not the case here.  For example, reasonable minds could consider the nature and extent of the odor and conclude it is a nuisance because it affects the ranch's natural water supply.  Likewise, even though the odor may be limited to one area on a large ranch, reasonable minds could find the odor especially troublesome given the ranch is frequently used for outdoor recreation and cattle operations.  Looking at the totality of the evidence presented, a rational trier of fact could conclude that the odor injured the Lazy S ranch.  That conclusion need not be an absolute certainty.

Finally, though we decline to reach the issue, the dissent discusses damages, suggesting that they are incredible and should inform our inquiry into injury.  Of course, the amount of damages is separate from whether Lazy S has presented sufficient evidence to create a genuine issue of material fact as to legal injury.

Lazy S presented sufficient evidence to create a genuine issue of material fact as to legal injury on its claims of private nuisance, public nuisance, and negligence per se.

### 2. The district court erred in granting summary judgment on the issue of causation.

To defeat summary judgment, Lazy S must also establish a genuine issue of fact as to whether Valero proximately caused its injuries.  Jones v. Mercy Health Ctr., Inc., 155 P.3d 9, 14 (Okla. 2006).  "Causation need not be established to a degree of absolute certainty."  Id.  But "[s]peculation is the antithesis of proximate cause[.]"  Butler ex rel. Butler v. Okla. City Pub. Sch. Sys., 871 P.2d 444, 446 (Okla. Civ. App. 1994).

Lazy S presented sufficient evidence to show the existence of a genuine issue of material fact as to causation. Lazy S contends that Valero was the only source of refined product near Tulip Springs, making it the cause of contamination. Aplt. Br. at 26–27. Valero argues there were too many alternate sources to conclude that its pipeline caused the contamination. Aplee Br. at 12–13. The district court held that the plaintiff failed to adequately eliminate several potential sources, including the old Blue Knight Pipeline, the aquifer, radio relay towers, underground storage tanks, asphalt roadways, and asphalt millings. IX Aplt. App. 113. But in its response to Valero's motion for summary judgment, Lazy S presented evidence that, if taken in the light most favorable to it, would eliminate most of these sources — the depositions of Dr. Ede and Dr. Fisher, and the report of Dr. Fisher. V Aplt. App. 26 (citing Ede Depo., id. at 109–11).

Dr. Ede opined that the Valero pipeline was the only source of refined product on the ranch, and he could find no other source. Id. at 109–10. Likewise, Dr. Fisher's report concluded that "the only significant source of gasoline and/or diesel fuel . . . is the Valero pipeline." Aplee. App. 350. In analyzing the tests he performed at the ranch, Dr. Ede noted that the petroleum distillates found were "relatively fresh[.]" V Aplt. App. 111. Dr. Fisher testified that the contaminates found were "fresh material" of "relatively recent origin[.]" Id. at 85. Lazy S's response to Valero's motion for summary judgment points to a portion of Dr. Ede's deposition where he opined that "relatively fresh" meant that some of the petroleum distillates found on the ranch were no more than three to six months old. Id. at 37 n.8 (citing id. at 116 (Ede Depo. 96:15–21)).

This testimony, taken in the light most favorable to Lazy S, gives rise to a reasonable inference that any source of contamination on the ranch older than six months cannot be a plausible source of contamination. And it rules out most of the major sources of refined petroleum products on the ranch. For example, the old Blue Knight pipeline stopped carrying refined products in 2008, nearly 10 years before Lazy S discovered the contamination. IX Aplt. App. 112. And the new Blue Knight pipeline carries crude oil, not refined products. Id. at 87. The two underground storage tanks closest to the ranch, which Valero's expert Bert Smith believed could be a source of contamination, were removed in the early 1990s. Aplee. App. 514 (graph).

The only testimony Valero presented casting doubt on this testimony was from Dr. Stout, who testified that karst formations underneath the ranch could trap old hydrocarbons, isolate them from the elements, and prevent weathering. Aplee. App. 966. These trapped hydrocarbons would appear no older than freshly produced hydrocarbons. And they could be the source of the contamination, rather than Valero's product. This "battle of the experts that the parties present to us requires a trial and a trier of fact to resolve." Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., 492 F.3d 1164, 1188 (10th Cir. 2007) (Ebel, J., concurring).

Other sources of contamination may exist: lubricating oils from windmills, cooling oils from an electrical gathering complex, transformers on radio towers, nearby highways (Interstate 35, US-77), a large pile of asphalt millings, and another ranch with outbuildings and equipment. Aplee. App. 519–21. But in its response to Valero's motion for summary judgment, Lazy S cited testimony from Dr. Fisher that would eliminate

24

most of these sources. V Aplt. App. 26. The district court failed to recognize that this testimony could defeat summary judgment. Even without it, a rational juror could infer that none of these contaminants would be strong enough to produce the foul, headache-inducing smell emanating from Tulip Springs. Again, a trial is necessary.

The remaining evidence presented by Lazy S, while less decisive, supports its theory that the Valero pipeline caused the contamination. Lazy S's experts Fisher and MacBeth testified to the existence of pathways for hydrocarbons to travel from the Wynnewood pipeline to water sources on the ranch. V Aplt. App. 13 (citing Aplee. App. 409 (Macbeth Rep., 11–12)); IX Aplt. App. 111 (citing Aplee. App. 351 (Fisher Rep., 9)). Dr. Miller opined that the pipeline's inherent mechanical characteristics and flaws make it more susceptible to a leak. Aplee. App. 171, 181. In his report, Dr. Miller provided photographic evidence of a drip in the pipeline located on the southern border of the property. Id. at 182. Dr. Fisher noted that the Wynnewood pipeline leaked in a location just south of the ranch in 2018, spilling at least 23,000 gallons of refined product over the course of 30 days. Id. at 382. The leak went undetected until it pooled at the surface. Id.

In granting summary judgment for Valero, the district court speculated that the hydrocarbons on the ranch could be the result of an old release from another pipeline on the ranch or that they could be carried in by the aquifer. IX Aplt. App. 112–14 & n.17. Then it concluded that Lazy S's theory of causation was far too speculative to survive summary judgment. Id. at 114–15. We disagree. Given the contested evidence, a reasonable jury could decide this issue either way, depending upon its view of the

25

evidence and the credibility of the experts.  See Adler, 144 F.3d at 670.  The pipeline is a

major source of potential contamination beneath the ranch; it leaked in 2018; the age of

the contaminants rules out almost all other sources; and a pathway exists for

hydrocarbons to travel from the pipeline to Tulip Springs.  Without belaboring the point,

a rational jury could conclude that Valero is the source of contamination.

In summary, we reverse the district court's grant of summary judgment and denial

of post-judgment relief on Lazy S's claims for private nuisance, public nuisance, and

negligence per se (specifically under Okla. Admin. Code § 165:10-7-5 and Okla. Stat.

tit. 27A, § 2-6-105(A)) because Lazy S presented sufficient evidence to show the

existence of genuine issues of material fact as to legal injury and causation.  We remand

to the district court with directions to conduct a trial on the issues of private nuisance,

public nuisance, and negligence per se, including Lazy S's claims for damages.

We note that the district court did not fully reach the issue of damages because it

found that Lazy S failed to establish a genuine issue of material fact regarding legal

injury.  IX Aplt. App. 104.  Lazy S retained several experts to provide damage estimates:

Macbeth, Isaacs, and Boyle.  Macbeth calculated the estimated cleanup cost of the ranch

to be more than $35 million, Aplee. App. 405, Isaacs estimated the amount of property

damages to the ranch to be more than $13 million, id. at 91, and Boyle opined on the lost

market value of the ranch's groundwater due to contamination (estimated at $22 million)

id. at 241.  The district court reasoned that the opinions of these witnesses were largely

irrelevant because they failed to establish that the contamination injured Lazy S.  IX Aplt.

26

App. 103.  Having reversed that decision, we remand the case for trial including damages.

### B.       Federal Rule of Civil Procedure 56(d)

Lazy S argues the district court abused its discretion by granting summary judgment despite its request for more time due to Valero's failure to provide it with documentation regarding pipeline integrity.  We review the district court's denial of an extension under Federal Rule of Civil Procedure 56(d)[8] for abuse of discretion.  Bolden v. City of Topeka, 441 F.3d 1129, 1149 (10th Cir. 2006).  Under Rule 56(d), if a nonmovant, by affidavit or declaration, shows it cannot present essential facts to its opposition to a motion for summary judgment, the court may defer or deny the motion, allow the parties time to obtain affidavits or declarations, or issue any appropriate order to resolve the issue.  The nonmovant must expressly invoke the rule's protections and present an affidavit identifying the unavailable, probable facts and what steps it has taken to obtain them.  Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 732 (10th Cir. 2006).

Here, Lazy S presented neither affidavits nor declarations supporting its opposition to summary judgment.  Its invocation of the rule was limited to a brief sentence in its response to Valero's motion for summary judgment that "[m]etering information, though available, has not been provided to the plaintiffs[,]" along with a footnote stating that the metering information would provide additional evidence of leaks,

---

[8] Formerly Fed. R. Civ. P. 56(f).  See Ellis v. J.R.'s Country Stores, Inc., 779 F.3d 1184, 1205 n.12 (10th Cir. 2015).

pursuant to Rule 56(d).  V Aplt. App. 9 & n.1.  This fails to satisfy Rule 56(d)'s requirements, and we affirm the district court's decision to rule on summary judgment despite outstanding discovery.

## C.    Remaining Tort Claims

Before turning to Lazy S's motion for early disclosure, we briefly address Lazy S's remaining tort claims.[9]  Ultimately, we affirm the district court's grant of summary judgment on these claims.

### a. Constructive Fraud

Under Okla. Stat. tit. 15, § 59, constructive fraud occurs "[i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault . . . by misleading another to his prejudice[.]"  "Even an innocent misrepresentation may constitute constructive fraud where there is an underlying right to be correctly informed of the facts."  Sutton v. David Stanley Chevrolet, Inc., 475 P.3d 847, 853 (Okla. 2020) (citation omitted).  In its motion opposing summary judgment, Lazy S failed to point out sufficient evidence to create a genuine issue of material fact that Valero knew the pipeline was leaking or overlooked the leak and failed to disclose this information to Lazy S consistent with a claim for constructive fraud.

---

[9] Oklahoma courts refrain from exercising their equitable jurisdiction to grant relief for unjust enrichment if the plaintiff has an adequate remedy at law.  Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028, 1035 (Okla. 2006).  Lazy S presented no evidence that an adequate remedy at law does not exist.  Summary judgment in favor of Valero was proper on this claim.

### b. Trespass

A trespass is an "actual physical invasion of the property of another without permission." Beal v. W. Farmers Elec. Coop., 228 P.3d 538, 541 (Okla. Civ. App. 2009) (citation omitted). Oklahoma recognizes both tangible and intangible trespass. See id. While we find Lazy S's trespass claim to be intangible, we note that an intangible trespass requires intent. Id. Because Lazy S presented no evidence of Valero's trespassory intent, summary judgment on this claim in favor of Valero was proper.

### D. Motion for Early Disclosure of Citizenship

Lazy S moves this court to enter an order requiring Valero Partners Wynnewood, LLC and Valero Partners Operating Co., LLC, to identify their members and state their citizenship for purposes of diversity jurisdiction. In its opening brief, Valero clarified the citizenship of both LLC's. Aplee. Br. at 3–4. Thus, we deny Lazy S's motion as moot.

Accordingly, the district court's judgment is AFFIRMED in part and REVERSED in part. We REMAND to the district court with directions to conduct a trial on the issues of negligence per se, private nuisance, and public nuisance including Lazy S's claims for damages.

23-7001, 23-7020, *Lazy S Ranch Properties, LLC, v. Valero Terminaling and Distribution Company, Inc.*
**PHILLIPS**, J., dissenting.

I would affirm the district court's order granting Valero's motion for summary judgment. On the record before it, the district court considered this a "pipeline leak case without a leaking pipeline." Resp. Br. at 1. Lazy S Ranch set forth no more than a "scintilla of evidence" that it had been injured, and in my view, no reasonable jury could find for the plaintiff on that evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Several uncontested facts support my view.

To start, scientific testing revealed mere minuscule amounts of refined-petroleum-product hydrocarbons present in the soil, air, and water of the Lazy S Ranch, which fall far below regulatory safety levels. As a reference point for safe levels, Valero's experts cite standards from the Oklahoma Corporation Commission (OCC), the Oklahoma Department of Environmental Quality (ODEQ), the Oklahoma Water Resources Board (OWRB), and the United States Environmental Protection Agency (EPA). Experts on both sides gathered samples from the Lazy S Ranch and tested them for benzene, toluene, ethylbenzene, and xylenes—volatile organic compounds known to be present in gasoline—and total petroleum hydrocarbons (TPH). *Lazy S. Ranch Prop., LLC v. Valero Terminaling & Distrib. Co.*, No. 19-CV-425, 2022 WL 17553001, at *3 (E.D. Okla. Dec. 7, 2022). Valero's experts then compared the maximum

hydrocarbon concentrations found in the Ranch's soil, water, and air with regulatory safety levels, summarizing this data in three tables:

| | OCC Tier 1 Residential Surface Soil Levels[] | OCC Tier 1 Leaching to Groundwater Soil Levels[] | ODEQ Quality Cleanup Levels[] | EPA Regional Screening Levels[] | Maximum Concentration in Any Lazy S Sample[] |
|---|---|---|---|---|---|
| Benzene | 44 | 3 | N/A | 1.2 | *Below laboratory's reporting limits* |
| Toluene | 6700 | 6700 | N/A | 4900 | 0.055 |
| Ethyl-benzene | 5400 | 5400 | N/A | 5.8 | *Below laboratory's reporting limits* |
| Xylenes | 21000 | 2100 | N/A | 58 (total) | 0.068 |
| TPH | 4400 (condensate) 2600 (crude oil) | 3000 (condensate) 5000 (crude oil) | 50 (total) | N/A | 15.3 |

*Figure 1*: Table comparing soil samples with regulatory levels (values in mg/kg). Appellant App. vol. III, at 18 (citing Appellee App. vol. III, at 727–30; Appellee App. vol. IV, at 801) (footnotes omitted).

| | OCC Risk-Based Screening Levels[] | ODEQ Tier 1 Clean Up Levels[] | EPA Primary Maximum Contaminant Levels[] | FDA Requirements for Bottled Water Quality[] | OWRB[] | Maximum Concentration In Any Lazy S Sample[] |
|---|---|---|---|---|---|---|
| Benzene | 0.005 | | 0.005 | 0.005 | 0.022 | *Below laboratory's reporting limits* |
| Toluene | 1 | | 1 | 1 | 1.3 | 0.00203 |
| Ethylbenzene | 0.7 | | 0.7 | 0.7 | 0.530 | *Below laboratory's reporting limits* |
| Xylenes | 10 | | 10 | 10 | N/A | 0.00247 |
| TPH-condensate | 5 | 1 (total TPH) | N/A | N/A | N/A | 0.236 |
| TPH-crude oil | 5 | 1 (total TPH) | N/A | N/A | N/A | 0.236 |

*Figure 2*: Table comparing water samples with regulatory levels (values in mg/L). Appellant App. vol. III, at 20 (citing Appellee App. vol. III, at 729–33; Appellee App. vol. IV, at 802) (footnotes omitted).

| | EPA Target Indoor Air Concentrations[] | Maximum Concentration in Any Lazy S Sample[] |
|---|---|---|
| Benzene | 3.60 | 0.891 |
| Toluene | 5210 | 7.57 |
| Ethylbenzene | 11.2 | 1.74 |
| Xylenes (total) | 104 | 7.79 |

*Figure 3*: Table comparing air samples with regulatory levels (values in µg/m$^3$). Appellant App. vol. III, at 22 (citing Appellee App. vol. III, at 736; Appellee App. vol. IV, at 804) (footnotes omitted); *see also Lazy S. Ranch*, 2022 WL 17553001, at *11–12.

Importantly, Lazy S did not dispute the accuracy of the data contained in these summary tables.[1] And Lazy S's experts did not opine that the "quantities of hydrocarbons detected on the property are harmful." *Lazy S. Ranch*, 2022 WL 17553001, at *10; *see* Appellee App. vol. I, at 171–72; Appellee App. vol. II, at 346–47; Appellee App. vol. II, at 324.

The district court was therefore correct to conclude that Lazy S did not present sufficient evidence that hydrocarbon pollution existed on the Ranch "in quantities which are or will likely create a nuisance or which render or will

---

[1] Responding to Valero's undisputed material fact number 42, which contained the soil sample summary (*Figure 1*), Lazy S wrote: "**Disputed**. *See* Response 41." Appellant App. vol. V, at 18. But Lazy S's response to paragraph 41 disputed only the levels at which remediation is required, arguing that Oklahoma statutes prohibit pollution outright and require the restoration of "original groundwater conditions"—it did not dispute the accuracy of the data in the table itself. *Id.* And Lazy S did not attempt to dispute Valero's water and air sample summary data at all.

3

likely render the environment harmful or detrimental or injurious to public health, safety, or welfare." Okla. Stat. tit. 27A § 2-1-102(12) (defining pollution); *see Lazy S. Ranch*, 2022 WL 17553001, at *13 ("[T]he evidence before the court indicates that the levels of hydrocarbons are so low that they have not rendered the environment harmful or dangerous. And they are too insignificant to constitute a substantial interference with the use and enjoyment of Plaintiff's property.").

Defending its decision in a post-judgment order, the district court clarified that it did not grant summary judgment on the basis of these regulatory levels alone but explained that "the applicable regulatory thresholds were still relevant to the extent that they provided a benchmark for the levels at which these hydrocarbons were known to be harmful," and that Lazy S "did not present an alternative benchmark or any other evidence by which a reasonable jury could find that the hydrocarbon levels detected on the property were harmful." *Lazy S Ranch Prop., LLC v. Valero Terminaling & Distrib. Co.*, No. 19-CV-425, 2023 WL 2382725, at *4 (E.D. Okla. Mar. 2, 2023). To survive summary judgment on its nuisance claim, Lazy S needed to set forth sufficient evidence on which a jury could reasonably find that it has suffered "substantial interference with the use and enjoyment of property." *Laubenstein v. Bode Tower, L.L.C.*, 392 P.3d 706, 710 (Okla. 2016).

The majority agrees that the "trace amounts" of "contaminants found throughout the samples of ranch soil and water. . . on their own, do not create

4

any genuine issues of material fact." Maj. Op. at 11. But the majority describes this data as just "one [undisputed fact] of many that leads to our conclusion." *Id.* As I see it, the sample data continues to occupy center stage because the remaining pieces of evidence are insufficient for a reasonable jury to find in Lazy S's favor.

Take for example the district court's findings that "Lazy S never notified a regulatory agency of the contamination, workers on the ranch continue to drink the water through a filter, and cattle continue to graze on the property." *Id.* at 14; *see Lazy S. Ranch*, 2022 WL 17553001, at *13. These findings summarized undisputed material facts from the parties' summary judgment briefing. *Compare* Appellant App. vol. III, at 21 ("Plaintiff's owners continue to drink water sourced from Buzzard Springs[2] on the Ranch. No one has ever told Plaintiff the water was unsafe to drink or sell." (citations omitted)), *with* Appellant App. vol. V, at 19 (disputing only that the water is filtered); *and compare* Appellant App. vol. III, at 22 ("Cattle continue to freely drink the water from Tulip Springs and elsewhere on the Ranch."), *and id.* at 23 ("Cattle continue to graze freely on 'every foot' of the Ranch, including in areas where Plaintiff claims soil and water contamination exists and Plaintiff is not aware that any alleged contamination has injured any cattle."), *and id.* ("Plaintiff has

---

2 Out of nine springs on the Ranch, Buzzard Springs is the only one that "flows reliably year-round" and so "serves as the drinking water supply for the ranch." Appellee App. vol. II, at 376.

5

not altered any ranch operations as a result of environmental sampling or other data."), *and id.* ("Plaintiff has never notified any regulatory agency of any alleged contamination on the Ranch."), *with* Appellant App. vol. V, at 7, 20 (not disputing these facts).

Perhaps recognizing that "an intermittent odor in one place on a 6,150-acre ranch . . . is too insubstantial as a matter of law to constitute substantial injury," Resp. Br. at 38, the majority relies on Lazy S's belated reports of something more than just odors—"resulting headaches," Maj. Op. at 14. *See Laubenstein*, 392 P.3d at 709 (quoting *Kenyon v. Edmundson*, 193 P. 739, 741 (Okla. 1920)) (observing that "a mere trifling annoyance, inconvenience, or discomfort" does not constitute a nuisance); *Baker v. Chevron USA, Inc.*, No. 05-CV-227, 2009 WL 3698419, at *6 (S.D. Ohio Nov. 4, 2009), *aff'd*, 533 F. App'x 509 (6th Cir. 2013) (explaining that intermittent reports of diesel fuel odors did not result in "any substantial annoyance or discomfort to Plaintiffs").

Though Lazy S makes much of these headaches in its post-judgment motion and on appeal to us, it barely mentioned them at summary judgment. *See Lazy S Ranch*, 2023 WL 2382725, at *5 ("At summary judgment, Plaintiff made just one reference to the odors causing stress, including headaches." (cleaned up)). So I question, as Valero has on appeal, whether Lazy S adequately raised these alleged injuries before the district court. Here I part with the majority, which faults the district court for "downplay[ing] the

6

evidence supporting the strong odor emanating from the cave near Tulip Springs and the resulting headaches." Maj. Op. at 14. Though the majority acknowledges that "Lazy S's motion opposing summary judgment does not explicitly declare that Kevin Blackwood and his friends suffered headaches at Tulip Springs," it nevertheless concludes that "the citation to the record was sufficient." *Id*. at 15. I disagree.

For starters, Lazy S flouted the Local Rules of Civil Procedure for the Eastern District of Oklahoma, which require a nonmovant to "[s]eparately," and "in concise, numbered paragraphs, state any additional facts the nonmovant contends preclude judgment as a matter of law." E.D. Okla. Civ. R. 56.1(c). Ignoring this rule, Lazy S lumped its additional facts into a "section responding . . . to the facts that the movant contends are not in dispute" and "stat[ing] any fact that is disputed." *Id.* The district court generously overlooked this procedural deficiency, but it was not required to do so.

So that the reader may appreciate what was before the district court on this issue, here is Lazy S's response to Valero's undisputed material fact number nine, in full:

9.    In July 2018, Robert Charles "Cinco" Roos claims to have smelled a diesel fuel odor emanating from Tulip Springs, marking the "first person or representative of" the Ranch to discover something "amiss."

**RESPONSE: Disputed**. This is the Defendants' sole discussion regarding smells or odors of hydrocarbons at Tulip Springs. Several individuals have smelled hydrocarbon odors at Tulip Springs, including Mr. Cinco Roos and his father

7

Charles Roos and Charles' wife (and Cinco's mother), Kevin Blackwood and his wife, Randy Miller, Bert Fisher, and Blake Redden. (Exhibit "D" - Fisher Depo. Page 156, lines 10-22; Page 157, lines 3-25 through Page 158, lines 1-14; Fisher Report Dkt. 131 page 28; Exhibit "L" - Blackwood Depo. Page 15 Lines 11-21; Page 103, Lines 1-25 to Page 104, Lines 1-4; Exhibit "N" at 61:23-24; 62:1-3). Furthermore, Dennis Thompson visited the cave on the Lazy S Ranch on four occasions, and it smelled strongly of gas fumes to the extent that no one would ignite a lighter for fear of ignition due to the gasoline fumes. See Exhibit "O" Thompson Dep. 6: 7-12; 7: 23-25; 8: 1-9; 9: 23-25-10:1; 14: 6-15; 16: 2025; 17: 12-25; 18: 1-14; 26: 23-25; 27: 2-5; 34: 1-25; 35: 1-11; 36: 17-25; 37: 1-13; 38: 1-12; 41: 11-20; 43: 1-6. In 2011, 2013, and August 2018, Geologist Kevin Blackwood examined the karst features of Tulip Springs, and both he and Mr. Thompson were shocked that the springs still smelled of gasoline. *Id*.; *also see* Exhibit "L" Blackwood Dep., p. 15: 15-25; 16:1-5, 24-25; 17: 1-5; 103:1-16; 112: 20-25. Geologist Kevin Blackwood also smelled gasoline at Tulip Springs and observed a leak in the Pipeline during digs at the Ranch. *See* Exhibit "L" Blackwood Dep., 132: 21-25; 133: 1-5; 11-15. ("Q You saw something leaking out of that? A Yeah, it was a fluid coming out of the line.") *Id*; 19:21-25, 160:1-10; 170: 23-25; 174: 1-8. He was afraid of an explosion due to the strong presence of gasoline at Tulip Springs, and they immediately left the site. *Id* at 174: 1-8; 17.

Appellant App. vol. V, at 9–10.

Notably, Lazy S's response to Paragraph 9 does not mention the words "headache" or "stress." Despite this, the majority faults the district court for not combing through the forty-odd record cites (in this paragraph alone) to discover the "one record reference" which "points out that Kevin Blackwood suffered headaches along with 'several of [his] friends.'" Maj. Op. at 15 (citing Appellant App. vol. V, at 10; and then quoting Appellant App. vol. VI, at 99).

8

Further, the majority criticizes the district court for not considering the legal significance of all the cited testimony. *Id.* at 14–15. But the district court cannot abandon its "limited and neutral role in the adversarial process" to become an advocate who "make[s] a party's case for it." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). Where a party fails to meet the burden "to present such specific facts by reference to exhibits and the existing record," we should "not reverse a district court for failing to uncover them itself." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Indeed, the only time Lazy S mentions the word "headache" in its summary-judgment response brief is in an argument section on damages, where Lazy S asserts that the "'[l]oss of use and enjoyment' or 'loss of enjoyment of life' due to contamination has rendered the Ranch waters unsaleable and unswimmable, and undrinkable without treatment, and the gaseous odor of the contaminated springs causes stress, including headaches." Appellant App. vol. V, at 32. There, Lazy S cites only a few lines from the deposition of Ranch owner Robert Charles Roos IV, but like the Blackwood testimony mentioned above, Lazy S did not make its case by quoting or summarizing the most important points from that testimony in the main response text.[3] The district court still considered the testimony but concluded that, "[c]onstrued in the light

---

[3] The cited testimony states: "[I]t smells like a refined diesel product. It's kind of a cross between diesel, gasoline, kerosene smell. I can't describe the smell. And it will – if you s[t]ay there very long it will give you a headache and you can taste it in your mouth." Appellant App. vol. VII, at 176.

most favorable to Plaintiff, this testimony merely suggests that prolonged exposure to whatever the odor was emanating from this spring can cause a headache. It fails to support Plaintiff's present contention that the odor has caused multiple individuals to suffer from headaches, stress, or illness." *Lazy S Ranch*, 2023 WL 2382725, at \*5.

The majority also points to an expert report attached as an exhibit to Lazy S's motion for partial summary judgment (the denial of which Lazy S did not appeal), "indicating reports of headaches." Maj. Op. at 15. But like the other headache evidence, this mention was buried in the record: Lazy S's brief in support of its motion for partial summary judgment does not even mention the word "headache" or argue that the odors were bothersome. And the expert report itself only vaguely states that unnamed "[w]itnesses have reported petroleum odors at Tulip Springs following high precipitation events as early as 2004" and that "[t]hese observations include . . . reports of headaches after exposure to the refined petroleum product hydrocarbon odors." Appellant App. vol. I, at 220. The district court did not err by determining that Lazy S's evidence of headaches—and any argument for their legal significance—was insufficiently raised at summary judgment.

But even if Lazy S *did* adequately bring reports of headaches to the district court's attention, and even if a jury *could* determine that the odors and headaches experienced intermittently at one spring on a 6,150-acre ranch are enough of a "substantial interference" with Lazy S's use and enjoyment of

property to find Valero liable, that would hardly support Lazy S's damages estimates. Lazy S's damages experts "blindly rely on the opinions of Plaintiff's other experts that the entire property is contaminated." *Lazy S. Ranch*, 2022 WL 17553001, at *10. And despite a purchase price of around $8.6 million in December 2017, they estimate that remediation of the Ranch will cost $43,292,000, lost water profits will be $22,537,045, and damages to the market value of the land and buildings will total $13,050,000. Though "[o]rdinarily, the question of whether a nuisance exists, and its resulting damages, present fact questions for the jury," the huge disconnect between the injury alleged and the damages sought here gives me pause. *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 294 (Okla. Civ. App. 1996). Let's not forget that Lazy S does not dispute that the levels of hydrocarbons fall far short of any levels at which regulatory agencies would require remediation, that Lazy S never reported any contamination to any regulatory agency, and that no water sale has fallen through on account of any alleged pollution. And though Lazy S's counsel is assuredly not alone in "car[ing] whether or not [his] steak is dirty," Oral Argument at 10:12–18, Lazy S offered no evidence that its livestock have been injured or that it has had to change any of its cattle operations to remedy "dirty" steak. *Id.*

At oral argument, Lazy S's counsel exhorted the panel to remand the case for trial, attributing to G.K. Chesterton the aphorism, "the most uncommon thing is common sense." Oral Argument at 15:03–14. But "[w]e call a thing

11

common sense when it suffers from too much evidence in its favour; too much to be formulated or even remembered." G.K. Chesterton, *At the Sign of the World's End*, The New Witness, Feb. 27, 1920, at 268. If Lazy S suffers from too much evidence in its favor, its counsel neither formulated nor remembered it when it mattered most. And courts, like artists, must "draw[] the line somewhere." G.K. Chesterton, *Our Note Book*, The Illustrated London News, May 5, 1928, at 780.

Because I agree with the line that the district court drew here, I respectfully dissent.